164 F.3d 215
 Pamela CARTER, Plaintiff-Appellant,
v.
T. Neal MORRIS, Individually and in his capacity as the
Chief of Police of the City of Danville Police
Department; City of Danville, Virginia,
Defendants-Appellees,
and
Unknown Agents of the City of Danville Police Department,
Defendants.
Pamela Carter, Plaintiff-Appellant,
v.
Unknown Agents of the City of Danville Police Department,
Defendants-Appellees,
and
T. Neal Morris, Individually and in his capacity as the
Chief of Police of the City of Danville Police
Department; City of Danville, Virginia,
Defendants.
 Nos. 98-1020, 98-1405.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 1, 1998.
Decided Jan. 14, 1999.
 
 ARGUED: Terry N. Grimes, King, Fulghum, Snead, Nixon & Grimes, P.C., Roanoke, Virginia, for Appellant. ON BRIEF: Yvonne Steenstra Wellford, Maloney, Huennekens, Parks, Gecker & Parsons, Richmond, Virginia, for Appellees.
 Before WILKINSON, Chief Judge, TRAXLER, Circuit Judge, and HILTON, Chief United States District Judge for the Eastern District of Virginia, sitting by designation.
 Affirmed by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge TRAXLER and Chief Judge HILTON joined.
 OPINION
 WILKINSON, Chief Judge:
 
 
 1
 Pamela Carter sued the City of Danville, Chief of Police Neal Morris, and unknown agents of the Danville Police Department in connection with her arrest and the search of her home. She asserted both federal claims under 42 U.S.C. § 1983 and state law claims. The district court granted summary judgment to the City and to Morris on all claims, and dismissed all claims against the unknown agents. Carter appeals, offering evidence of a wide range of unrelated incidents on the part of the police department to establish the existence of a city policy or custom of unconstitutional behavior.
 
 
 2
 Because Carter fails to establish the unconstitutional policy or custom with the appropriate precision, we affirm the judgment of the district court with regard to municipal liability. Similarly, Carter's failure to establish a particularized link between Morris' alleged indifference to specific police conduct and her alleged injury requires affirmance of the district court's judgment with respect to him. Finally, we affirm the district court's judgment with regard to Carter's state law claims.I.
 
 
 3
 In June 1994 an eyewitness implicated Pamela and Corey Carter in a series of crimes that had recently occurred in Danville, Virginia. The witness, Michael Cobbs, claimed he had seen Corey Carter and another male leave a Piggly Wiggly store at around the time the store was robbed; he further indicated that a female had driven their getaway vehicle. Cobbs then picked Pamela Carter out of a photo lineup as the driver. He also told police that Ms. Carter had admitted to driving the getaway car in the Piggly Wiggly as well as sixteen other robberies, including a robbery and murder at a local Winn Dixie store.
 
 
 4
 On June 12, 1994, the police obtained information that Corey Carter was at home. They received an arrest warrant for him and a search warrant for his person, and at approximately 2:00 p.m. they raided the Carter residence.
 
 
 5
 Pamela Carter's version of events runs as follows. The police used a sledge hammer to break open her front door, and they burst into her bedroom without warning. One of the officers put a gun to her ear, while another put one to her mouth and ordered her to lie down. The officers then handcuffed her and told her she was under arrest for the Winn Dixie and Piggly Wiggly robberies. Carter claims that she urinated on herself at some point during the incident, and that the police refused her request to change clothes. She also maintains that the officers treated her children roughly and placed them in the care of a stranger.
 
 
 6
 The police took Carter from her home and brought her to the police station. Carter contends that her handcuffs were too tight and that the police pushed her legs as she got into their patrol car. While at the station, the police subjected her to a "lengthy, intensive, and accusatory" interrogation. She maintains that the police refused to let her use the bathroom, and that she urinated on herself again. She also claims that two officers taunted her with racial epithets.
 
 
 7
 At the end of the interrogation an officer allegedly told Carter that if she signed papers she could go home. The papers she signed included a consent form for the officers to search her house. The police did so, and seized some of her husband's effects. They then released her.
 
 
 8
 Roughly three weeks later the police showed Carter in person to the informant, Cobbs. Upon seeing her, Cobbs stated that she was not the person whom he had seen driving the car from the Piggly Wiggly and who admitted participating in the other robberies. Pamela Carter was never charged for the crimes. Corey Carter was tried and acquitted of the Piggly Wiggly robbery, and other persons were eventually convicted of the Winn Dixie crimes.
 
 
 9
 Pamela Carter contends that the police continued to harass her after this episode. Officers put the Carters' home under surveillance, and some allegedly made vulgar comments to her. Carter claims that she attempted to file a complaint at the police station, but that the officers on duty refused to let her do so.
 
 
 10
 Ms. Carter then filed this suit in the United States District Court for the Western District of Virginia against the City, Morris, and the unknown agents. She asserted section 1983 claims against each defendant for unlawful arrest, excessive force, and the unlawful search of her home. To establish municipal liability, she claimed that the City maintained a policy or custom of ignoring or condoning unconstitutional police conduct. Additionally, she asserted several state tort claims.[1]
 
 
 11
 After discovery, the district court granted summary judgment to the City and to Morris on all claims. Carter failed to effectively pursue her claims against the individual officers, and the district court dismissed those claims as res judicata and as barred by the statute of limitations. Carter appeals her section 1983 and state law claims against the City and Morris.[2]II.
 
 A.
 
 12
 We begin with Carter's claims against the City. Assuming arguendo that she suffered a deprivation of her federal rights, it is by now well settled that a municipality is only liable under section 1983 if it causes such a deprivation through an official policy or custom. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipal policy may be found in written ordinances and regulations, id. at 690, 98 S.Ct. 2018, in certain affirmative decisions of individual policymaking officials, Pembaur v. City of Cincinnati, 475 U.S. 469, 483-84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens, City of Canton v. Harris, 489 U.S. 378, 388-89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Outside of such formal decisionmaking channels, a municipal custom may arise if a practice is so "persistent and widespread" and "so permanent and well settled as to constitute a 'custom or usage' with the force of law." Monell, 436 U.S. at 691, 98 S.Ct. 2018 (internal quotation marks omitted).
 
 
 13
 We must bear in mind, however, that no municipality can "be held liable under § 1983 on a responde at superior theory." Id. A plaintiff's theory is most likely to slip into that forbidden realm when she alleges municipal omission--either a policy of deliberate indifference or the condonation of an unconstitutional custom. Board of County Comm'rs v. Brown, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Id.; see also City of Canton, 489 U.S. at 391-92, 109 S.Ct. 1197.
 
 
 14
 Thus, a plaintiff cannot rely upon scattershot accusations of unrelated constitutional violations to prove either that a municipality was indifferent to the risk of her specific injury or that it was the moving force behind her deprivation. Instead, a "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Brown, 520 U.S. at 411, 117 S.Ct. 1382 (emphasis added); see also City of Canton, 489 U.S. at 391, 109 S.Ct. 1197 ("[T]he identified deficiency ...must be closely related to the ultimate injury."); Spell v. McDaniel,824 F.2d 1380, 1389-91 (4th Cir.1987); Milligan v. City of Newport News, 743 F.2d 227, 230 (4th Cir.1984). Thus, municipal liability will attach only for those policies or customs having a "specific deficiency or deficiencies ... such as to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run." Spell, 824 F.2d at 1390 (internal quotation marks omitted) (emphasis added). The challenged policy or custom cannot merely be the abstract one of violating citizens' constitutional rights.
 
 
 15
 The requirement of a close fit between the unconstitutional policy and the constitutional violation serves three purposes. First, it helps to ensure that a municipality has made "a deliberate choice to follow a course of action ... from among various alternatives." City of Canton, 489 U.S. at 389, 109 S.Ct. 1197 (internal quotation marks omitted). Second, it assures that this choice was in fact the "moving force" behind a deprivation of federal rights. Monell, 436 U.S. at 694, 98 S.Ct. 2018. A careful examination of this "affirmative link" is essential to avoid imposing liability on municipal decisionmakers in the absence of fault and causation.
 
 
 16
 Third, by requiring litigants to identify the offending municipal policy with precision, courts can prevent trials from straying off into collateral accusations of marginally related incidents. Section 1983 does not grant courts a roving commission to root out and correct whatever municipal transgressions they might discover--our role is to decide concrete cases. Unfocused evidence of unrelated constitutional violations is simply not relevant to the question of whether a municipal decisionmaker caused the violation of the specific federal rights of the plaintiff before the court. Permitting plaintiffs to splatter-paint a picture of scattered violations also squanders scarce judicial and municipal time and resources. As a practical matter, a case involving inquiries into various loosely related incidents can be an unruly one to try.
 
 B.
 
 17
 In this case, Carter does not allege that the City of Danville promulgated any formal unconstitutional policy. Rather, she asserts that the City has remained deliberately indifferent to or has actively condoned a long and widespread history of violations of the federal rights of citizens on the part of its police department. But Carter's proffered evidence, mainly allegations of prior instances of excessive force and the discouragement of citizen complaints, ranges far a field of her own alleged constitutional injuries. Her approach is insufficiently precise to establish the existence of a municipal policy or custom that actually could have caused her specific injuries.
 
 
 18
 On the record before us, Carter's only plausible federal claims are that Danville police officers subjected her to an unreasonable search and seizure and to an unlawful arrest.[3] The bulk of her evidence, however, is not relevant to those claims. First, Carter relates a number of incidents spanning the 1980s and early 1990s in which various police officers, including such now-senior officers as Chief Morris and Captain P.L. Heffinger, allegedly beat handcuffed suspects and otherwise treated citizens roughly. Although these incidents may tend to show that there is some "specific deficiency" in a city policy, Spell, 824 F.2d at 1390, or at least a "known but uncorrected custom or usage" on the part of city police officers, id. at 1391, there is no affirmative link between the deficiency this evidence suggests and the particular violations of which Carter complains. Past incidents of excessive force do not make unlawful arrests or unreasonable searches or seizures "almost bound to happen, sooner or later, rather than merely likely to happen in the long run." Id. at 1390, 1391 (internal quotation marks omitted). Carter in essence claims that past generalized bad police behavior led to future generalized bad police behavior, of which her specific deprivations are an example. This nebulous chain fails the "rigorous standards of culpability and causation" required for municipal liability under section 1983. Brown, 520 U.S. at 405, 117 S.Ct. 1382.
 
 
 19
 Second, Carter alleges that the City ignores or covers up citizens' complaints of improper police conduct. The ignorance of complaints of unlawful official behavior, if sufficiently particularized, may show that the City was indifferent to or condoned that behavior. Carter's evidence, however, is not so targeted--the complaints she cites regarded mainly unspecified or unrelated underlying incidents. Carter's evidence thus bears no relation to the showing required for liability to attach to the City of Danville in this case--deliberate indifference to or condonation of particularized violations that are similar in kind to her own.
 
 
 20
 Indeed, once we filter out these unrelated accusations we are left with only two instances--in addition to Carter's own--of even arguably unlawful arrests or unreasonable searches and seizures by the Danville police department. As evidence of unconstitutional municipal conduct, however, these incidents are exceedingly thin gruel. In the first, then-Sergeant Heffinger arrested a woman without cause during the investigation of a barking dog complaint in 1987. The record shows, however, that the police department investigated the incident and that Chief Morris suspended Heffinger for three days without pay. This incident thus does not support a conclusion that the City is deliberately indifferent to or condones improper behavior on the part of its officers. In fact, it shows just the opposite.
 
 
 21
 The second arguably similar incident stems from the mistaken effort of Danville police officer Chad Clark to serve a capias on Roy James Hood on June 16, 1996. According to Hood's affidavit, Clark insisted on taking him into custody even after Hood explained that the same capias had been served on him two days earlier. Hood also asserts that the department resisted his efforts to file a complaint about the incident. We are not certain, however, that Hood's affidavit even states a deprivation of a federal right. The affidavit itself not only suggests that Clark believed there was an outstanding arrest warrant for Hood, it also states that Clark released him as soon as the department informed him of his error. Cf. Hill v. California, 401 U.S. 797, 802-04, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971) (arresting the wrong person based on a reasonable mistake does not violate the Fourth Amendment).
 
 
 22
 Even assuming that the Hood incident states a federal violation, Carter's evidence falls far short of proof of an unconstitutional municipal policy. At best Carter's two decade survey of police conduct offers only one other uninvestigated complaint of unlawful arrest in the City of Danville--and that resulting from apparently reasonable error. This evidence fails to show that the City of Danville is deliberately indifferent to the relevant rights of its citizens. And one looks in vain for a possible causative link between any municipal decision and Carter's own experience.
 
 
 23
 Nor does this meager history of isolated incidents approach the "widespread and permanent" practice necessary to establish municipal custom. Greensboro Prof'l Fire Fighters Ass'n v. City of Greensboro, 64 F.3d 962, 967 (4th Cir.1995). In fact, Carter has shown no relevant incident prior to her own case of which the City could have had knowledge and in which it acquiesced. See Spell, 824 F.2d at 1391.
 
 
 24
 The inadequacy of Carter's evidence is particularly apparent when contrasted with that elicited in Spell. The plaintiff in that case, Henry Spell, sued individual officers and the City of Fayetteville for irreversible injuries suffered when police officer Charles McDaniel kneed him, while handcuffed, in the groin. Id. at 1384. At trial, Spell presented the testimony of lay witnesses who had "observed or directly experienced acts of brutality by city police officers of the type charged to McDaniel." Id. at 1393. Two officers testified that the City trained its personnel in the same groin-kneeing technique that McDaniel had applied to Spell. Id. McDaniel himself testified that he was taught this technique at the city police academy, which was run by the city police chief. Id. at 1393-94. Other officers testified not only that a "code of silence" prevented the punishment of officers on the force, but also that the police chief condoned and advocated the use of excessive force on arrestees. Id. at 1393. Police internal affairs files, also introduced into evidence, "graphically corroborated" this testimony. Id. at 1394. Finally, the assistant state district attorney testified that he had prosecuted two police officers for assaulting suspects. Id. at 1393. In sum, Spell introduced voluminous evidence both of prior incidents and of official encouragement of exactly the same constitutional injury that he had suffered.
 
 
 25
 By contrast, to hold the City of Danville liable on the record before us would be to impose liability without cause. We therefore hold that the district court properly granted summary judgment in favor of the City.
 
 III.
 
 26
 Carter's supervisory liability claim against Chief Morris fails for similar reasons. We have recognized section 1983 claims against supervisory employees where citizens "face a pervasive and unreasonable risk of harm from some specified source ... [and] the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive [practices]." Slakan v. Porter, 737 F.2d 368, 373 (4th Cir.1984) (internal quotation marks omitted). As with municipal liability, respondeat superior is not the standard. A plaintiff must show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and "an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir.1994).
 
 
 27
 The record is devoid of evidence supporting this claim. Carter offers only one prior incident similar to her own of which Chief Morris was or should have been aware--Heffinger's 1987 unlawful arrest. As noted, Morris' treatment of that incident tends to negate, not support, a claim of deliberate indifference. When a supervisor investigates a claim of improper police conduct and suspends the offending officer, it simply cannot be said that he is indifferent to the risk of the underlying constitutional violation. The district court correctly dismissed Carter's supervisory liability claim against Morris.
 
 IV.
 A.
 
 28
 We now turn to Carter's state tort claims against the City, which the district court read to include assault, battery, and false imprisonment. In Virginia "as a general rule, the sovereign is immune ... from actions at law for damages." Hinchey v. Ogden, 226 Va. 234, 307 S.E.2d 891, 894(Va.1983). Although Carter argues otherwise, it is plain that this protection extends to municipalities in the exercise of their governmental functions, Hoggard v. City of Richmond, 172 Va. 145, 200 S.E. 610, 611 (Va.1939), one of which is certainly the maintenance of a police force.
 
 
 29
 Carter argued in the district court that the City is not immune from liability for the intentional torts of its employees. She cited no relevant authority for this proposition at that time or on appeal, however, and this court can find none.
 
 
 30
 We also find no authority that this immunity has been waived. In fact, the Virginia Tort Claims Act, which waives the state's immunity for certain claims, expressly disclaims any effort "to remove or in any way diminish the sovereign immunity of any county, city, or town in the Commonwealth." Va.Code Ann. § 8.01-195.3. Carter's state tort claims against the City are therefore barred by sovereign immunity.
 
 B.
 
 31
 Although Carter asserted the same tort claims against Chief Morris, the district court found no evidence that Morris actually participated in or authorized the raid on the Carter home or her interrogation. On appeal Carter provides no rationale for holding Morris liable directly or indirectly for any injuries she may have suffered, and we can ascertain none. We therefore hold that the district court properly dismissed Carter's state law claims against Chief Morris.
 
 V.
 
 32
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 AFFIRMED
 
 
 [1]
 Carter also asserted that defendants conspired to deprive her of her civil rights in violation of 42 U.S.C. § 1985. The district court dismissed this claim--a ruling that has not been appealed
 
 
 [2]
 Although Carter filed a notice of appeal from the order dismissing her claims against the unknown agents, she failed to brief or argue the grounds for the district court's dismissal and therefore waives those issues. See Fed. R.App. P. 28(a)(6); 11126 Baltimore Blvd., Inc. v. Prince George's County, 58 F.3d 988, 993 n. 7 (4th Cir.1995) (en banc)
 
 
 [3]
 Although Carter's complaint also alleges that she was subjected to excessive force, she submits only minimal evidence in support of that claim. In fact, Carter's basis for her excessive force claim--that her handcuffs were too tight and that an officer pushed her legs as she got into the police car--is so insubstantial that it cannot as a matter of law support her claim under either the Fourth Amendment, see Martin v. Gentile, 849 F.2d 863, 868-69 (4th Cir.1988) (force during arrest), or the Fourteenth, see Riley v. Dorton, 115 F.3d 1159, 1166-67 (4th Cir.1997)(en banc) (force during detention), cert. denied, --- U.S. ----, 118 S.Ct. 631, 139 L.Ed.2d 611 (1997)
 Similarly, although Carter alleges that individual officers insulted her with racial epithets, such undeniably deplorable and unprofessional behavior does not by itself rise to the level of a constitutional violation. See Patton v. Przybylski, 822 F.2d 697, 700 (7th Cir.1987).