**David LYTLE, Jeanette Lytle, and Joan Maguire, Plaintiffs,**

v.

**Jack DOYLE, et al., Defendants.**

**Civil Action No. 299CV1366.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Dec. 17, 2001.

Anthony S. Mulford, Davis & Brynteson, P.C., Chesapeake, Scott D. Cardani, Richmond, Michael J. DePrimo, Stephen M. Crampton, Brian Fahling, American Family Association, Center for Law & Policy, Tupelo, MS, for Plaintiffs.

Kevin O. Barnard, Gregory E. Lucyk, William H. Hurd, Mark L. Earley, Office of the Attorney General, Richmond, VA, for Defendant Jack Doyle, Etc.

Alison P. Landry, Kevin O. Barnard, Thomas J. Lambert, Gregory E. Lucyk, William H. Hurd, Mark L. Earley, Office of the Attorney General, Richmond, VA,

for Defendant Charles D. Nottingham, Etc.

Jack E. Cloud, Harold P. Juren, Office of the City Attorney, Norfolk, VA, for Defendant City of Norfolk, Virginia.

## ORDER AND OPINION

FRIEDMAN, District Judge.

The plaintiffs, David Lytle, Jeanette Lytle, and Joan Maguire (collectively, the "Lytles"), have challenged the constitutionality of Virginia Code Section 46.2–930, which prohibits loitering on bridges designated by the Commonwealth's Commissioner of Transportation. The Lytles initially filed this action on August 27, 1999 to enjoin the enforcement of the statute on the grounds that it violates their First and Fourteenth Amendment rights. On November 2, 1999, the court issued an Opinion and Order granting the preliminary injunction. Currently pending before the court are cross-motions for summary judgment.

The defendants in this case are Jack Doyle, the Commonwealth's Attorney for the City of Norfolk; Charles D. Nottingham, the Commissioner of Transportation for the Commonwealth of Virginia (collectively, the "Commissioner"); and the City of Norfolk, Virginia (the "City").[1] Plaintiffs allege that the Virginia statute is unconstitutional and seek nominal damages from the City under 42 U.S.C. § 1983. The motions have been fully briefed, and

the court held a hearing on this matter on November 27, 2001. The court finds that there are no material facts in dispute, and the case can be decided on the summary judgment motions. For the reasons that follow, the court holds that the statute is unconstitutionally vague, but that the plaintiffs are not entitled to relief under 42 U.S.C. § 1983.

## FACTUAL BACKGROUND

The Lytles are anti-abortion protestors who participated in a demonstration against abortion on July 16, 1999 on the Picadilly Overpass ("the Overpass"), a pedestrian bridge crossing Interstate 64 in the City of Norfolk. At the time, there were signs posted at the Overpass that prohibited loitering. The protestors demonstrated by holding large posters with messages opposing abortion. Lt. Charles Brewer, a police officer in the Norfolk Police Department, arrived at the Overpass with other officers and warned the protestors that they would be arrested for loitering if they did not halt their activities. After two protestors were arrested, the Lytles ceased their demonstration and left the Overpass. Following the July 16 demonstration, it was determined that the "no loitering" signs were erroneously posted at the Overpass without the consent of the Transportation Commissioner. On August 27, 1999, the Lytles filed a complaint under 42 U.S.C. § 1983, alleging violations of their constitutional rights and challenging

---

**1.** The plaintiffs originally filed suit against Charles Brewer, individually and in his official capacity as Lieutenant of the Norfolk Police Department; Charles D. Griffith, Jr., in his official capacity as Norfolk Commonwealth Attorney; and Hon. James S. Gilmore, III, in his official capacity as Governor of the Commonwealth of Virginia. None of these original defendants remain in this case. The Court dismissed Lt. Brewer in both his personal and official capacities in December, 1999, but granted the plaintiffs the opportuni-

ty to amend their complaint to include a claim against the City of Norfolk. See Lytle v. Brewer, 77 F.Supp.2d 730, 743 (E.D.Va.1999). The Court also dismissed Governor Gilmore, but permitted the plaintiffs to substitute Commissioner Nottingham as the appropriate defendant. See Lytle v. Doyle, No. 2:99cv1366 (E.D.Va. Jul. 19, 2001). Furthermore, since the plaintiffs initiated their lawsuit, Mr. Doyle replaced Charles Griffith as the Norfolk Commonwealth's Attorney.

the constitutionality of the statute under which the police threatened to arrest the plaintiffs.

The facts surrounding the incident on July 16, 1999 are more fully explained in the court's November 2, 1999 opinion granting the Lytles' motion for preliminary relief, and the December 22, 1999 opinion dismissing the claims against Lt. Brewer. However, additional facts are necessary to properly resolve the Lytles' claim for damages under 42 U.S.C. § 1983. In that claim, the Lytles allege that the City police acted pursuant to a policy, custom, or practice, for which the City should be held liable.

*Organization of the Norfolk Police Department*

The Norfolk City Charter vests ultimate authority over the police department in the City Manager. As part of this authority, the City Manager established the following hierarchy of police department oversight:

1. City Manager
2. Deputy City Manager
3. Assistant City Manager
4. Chief of Police
5. Assistant Chief of Police
6. Captain
7. Lieutenant
8. Sergeant
9. Corporal
10. Officer II
11. Officer I

The Norfolk Police Department is split into a number of divisions, including three uniformed divisions: the First and Second Patrol Divisions and the Special Enforcement Division. The two patrol divisions were commanded by Assistant Chief of Police Joe Jackson at all times relevant to this case. The two patrol divisions are each commanded by a captain and are divided into three sectors, each of which is patrolled by a platoon commanded by a lieutenant. Every sector lieutenant has sergeants, corporals and police officers under his or her command. The Piccadilly Overpass is located in the Gold Sector of the Second Patrol Division. At all times relevant to this case, Captain Sharon Chamberlain commanded the Second Patrol Division, Lt. Betty Davis was the Gold Sector commander, and Lt. Brewer was the Blue Sector commander.

*Written Directives in the Norfolk Police Department*

A general order prescribed by the City Manager in accordance with section 60 of the Norfolk City Charter governs the preparation, format, and distribution of all written directives in the Norfolk Police Department. These include rules and regulations, manuals, standard operating procedures, memoranda, and personnel orders. All orders, rules and regulations applicable to the entire Police Department must be approved by the City Manager. Only standard operating procedures and personnel orders may be approved by the Chief of Police. Standard operating procedures are defined in the General Order as "operating procedures for the particular unit or division" which "do not establish substantive rules or policies." *See* Oliver Dep. Ex. 4, p. 3. No one lower in rank than the Chief of Police is authorized to issue any written directives. Any operating procedure approved by the Chief of Police for a particular unit is subject to review by the City Manager, who has the final authority.

*Previous Incidents with the Police*

At least one of the plaintiffs demonstrated at the Piccadilly Overpass on two separate occasions before the incident that gave rise to this case. On July 25, 1997, the plaintiffs and other protestors assembled at the Overpass but were eventually

ordered by State Police troopers and Norfolk police officers to leave. Unpersuaded, the plaintiffs returned approximately one year later on July 31, 1998, and resumed protesting. The Norfolk police again responded to the scene in response to a request from the Virginia State Police. The police instructed the protestors to leave because they believed the activity on the Overpass was adversely affecting the movement of traffic on the interstate, creating a dangerous traffic situation since the roads were slick from rain. No one was arrested at this time due to the uncertainty of any violations, but the officer reporting the incident to Captain Chamberlain noted that possible violations were "being researched." Captain Chamberlain notified her immediate superior, Asst. Chief of Police Jackson, of the "traffic circumstances" relating to this incident, but did not discuss the incident with any other superior officer. She also did not report the incident to anyone in the City Manager's office. Neither the City Manager, the Assistant City Manager supervising the Police Department, nor the Chief of Police had any knowledge of either incident until after this suit was filed. Similarly, Lt. Brewer, who was subsequently dispatched to the same location on July 16, 1999, had no knowledge of either incident.

Following the July, 1998 incident, Captain Chamberlain requested one of her sector lieutenants, Betty Davis, to investigate different options for handling the ongoing problems related to the use of the Overpass. Captain Chamberlain evidently spoke with an attorney from the Norfolk City Attorney's Office about the situation, and made notes during that conversation on post-it stickers.[2] At some point in August, 1998, "no loitering" signs were posted at the Overpass, presumably by the Virginia Department of Transportation. Neither the City Manager, the Assistant City Manager overseeing the Police Department, nor the Chief of Police knew of the existence of these "no loitering" signs.

*Davis Memorandum*

On August 7, 1998, Lt. Davis prepared a memorandum titled "Protestors on Pedestrian Bridge—(Norview and I-64)" (hereinafter "Davis Memo"). The Davis Memo instructs officers who observe protestors on the Overpass to "issue a summons for State Code 46.2–930 (Loitering on bridges)." The memo states that officers were to read to the protestors the following statement:

> You are in violation of State Code 46.2–930 Loitering on bridges. If you do not leave this area you will be placed under arrest. Do you understand? (no compliance) You are under arrest.

*See* Pl. Br. Ex. J (internal quotations omitted).

Lt. Davis drafted the Davis Memo after conversations with Norfolk Deputy City Attorney Andre Allen Foreman and Assistant Commonwealth's Attorney Richard Bragg concerning laws that might apply to individuals disrupting traffic from pedestrian walkways over interstate highways. Lt. Davis left a copy of this memo for Captain Chamberlain, with a note stating that the original "was put in [the] book for the troops." This book referred to the Second Patrol Division's "roll call" book in which information for officers of that division was inserted. While officers of the division were supposed to look at the roll call book on a regular basis, there is no evidence that they did, and no evidence that the contents of the Davis Memo were

---

**2.** One of the post-its read: "Don't address content because it places it in realm of 1st Amend. Keep in public safety realm."

orally communicated to the officers. Lt. Brewer never saw this memo until it was given to him by Captain Chamberlain in 1999. Neither the City Manager, the Assistant City Manager supervising the Police Department, nor the Chief of Police were ever made aware of the Davis Memo until well after the incident that gave rise to this suit.

*Events Subsequent to the July 16, 1999 Incident*

The City's Chief of Police was not aware of any protest incidents at the Piccadilly Overpass until a few days after the July 16, 1999 occurrence. He was not previously aware of Virginia Code § 46.2–930 or of the fact that "no loitering" signs had been posted at the Piccadilly Overpass. After being informed of the incident, the Chief of Police disseminated a memorandum to all Commands in the Norfolk Police Department. The memorandum stated that the Attorney General's Office was reviewing the constitutionality of Virginia Code § 46.2–930, and officers were not to cite that statute or its provisions when handling protest situations occurring on pedestrian crossovers until the Attorney General rendered an opinion. The memorandum further instructed that "each command will ensure respective personnel are aware of the content of this memo."

Joan Maguire, one of the plaintiffs in this case, returned to the Overpass and again demonstrated on July 21, 2000 and July 6, 2001. No Norfolk police officer approached or interfered with her on either occasion. Since August 3, 1999, over forty anti-abortion demonstrations (presumably not involving any of the plaintiffs) have occurred at the Overpass and the Norfolk police have not interfered in any of these protests. Administrative review of the conduct of Lt. Davis has been deferred pending the outcome of this case.

*Police Training*

Training of police officers in Virginia is regulated by the Virginia Department of Criminal Justice Services. The City submitted an affidavit stating that its departmental training exceeds the minimum compulsory requirements. *See* Burwell Affid., ¶ 4. Norfolk officers receive training in a broad range of law enforcement subjects. The training provided to Norfolk police recruits and officers is intended to equip them to properly handle the usual and recurring situations which, based on the experience of the Training Division staff, they are expected to encounter on a regular basis. The training is also intended to be sufficiently broad and varied as to enable officers to properly deal with less frequently occurring situations that may have serious consequences, such as firearms use. Training in legal subjects or subjects with a substantial legal component is primarily concentrated on the most commonly encountered types of police work, and includes search and seizure, basic criminal law, State and City Codes, probable cause, laws of arrest, rules of evidence, juvenile law, motor vehicle codes, and environmental crimes. Officers receive special training for rarely encountered situations when such situations have occurred with sufficient frequency to create an expectation that they are reasonably likely to occur again.

Norfolk police officers are not provided with specific training intended to teach officers the general constitutional rights of persons to assemble or protest on public rights of way, or how to determine the constitutionality of a law for themselves. Officers have also not received any training regarding the constitutional rights of persons to assemble and/or protest on pedestrian overpasses over highways. Training regarding loitering laws is not given to all Norfolk police officers, al-

though the right of persons to challenge loitering laws generally is briefly discussed in the Police Academy. In their training, general loitering ordinances, that is, those not related to drug transactions, prostitution or other particular situations or locations, are mentioned briefly as an example of laws frequently claimed to be unconstitutional. The Police Department does not expect recruits or officers to make their own constitutional law evaluations of laws published in the State and City Codes because Virginia police officers are expressly required by Virginia statutes to enforce the laws. *See* Va.Code Ann. §§ 15.2–1704 and 46.2–102. Specific training has not been given to all Norfolk police officers about Virginia Code § 46.2–930, and neither the Chief of Police nor the Commanding Officer of the Department's Training Division were aware of any need for such training. Neither individual was even aware of the existence of this law at the time of the incident.

### ANALYSIS

#### I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is apparent from the entire record, viewed in the light most favorable to the non-moving party, that there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. *See Clark v. Alexander*, 85 F.3d 146, 150 (4th Cir.1996); *see also, Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court may properly deny summary judgment when there is sufficient evidence favoring the nonmoving party that would allow a reasonable jury to return a verdict for that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). However, entry of summary judgment is mandated "against a party

who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The court must further grant summary judgment where "the evidence is so one-sided that one party must prevail as a matter of law." *Harleysville Mut. Ins. Co. v. Packer*, 60 F.3d 1116, 1120 (4th Cir. 1995) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505). All parties in this case agree that there are no material facts in dispute and summary judgment is appropriate.

#### II. THE CONSTITUTIONAL CLAIM

The basis of the Lytles' case is a constitutional challenge to the validity of a Virginia statute that prohibits loitering on bridges. The statute states as follows:

> Pedestrians shall not loiter on any bridge on which the Commonwealth Transportation Commissioner has posted signs prohibiting such action. Any person violating the provisions of this section shall be guilty of a traffic infraction.

Va.Code Ann. § 46.2–930 (Michie 1998). The Lytles challenge the statute on its face, and as applied to their expressive conduct. Specifically, the Lytles allege that the statute is unconstitutionally vague in violation of the First and Fourteenth Amendments to the United States Constitution.

##### A. Whether the Statute is Void for Vagueness

 The Lytles' central argument is that the loitering statute is "void for vagueness." Any attempt to prohibit loitering potentially implicates First Amendment rights. *See Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 1859, 75 L.Ed.2d 903 (1983) (loitering statute impli-

cates "First Amendment liberties" and "constitutional right to freedom of movement"); *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90–91, 86 S.Ct. 211, 213, 15 L.Ed.2d 176 (1965) (loitering ordinance affects First Amendment freedoms). Judicial scrutiny under the vagueness doctrine is most rigorous when the law in question impinges on First Amendment freedoms. *See Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974) ("[w]here a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."). Courts impose heightened scrutiny on statutes affecting the First Amendment because prohibitions of uncertain scope may have a "chilling effect" on the exercise of protected rights. As the Supreme Court stated in *Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), vague statutes cause citizens to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked," restricting their conduct "to that which is unquestionably safe. Free speech may not be so inhibited." *Id.* at 372, 84 S.Ct. 1316. Thus, the requirement of specificity is enforced with special rigor when it also serves to avoid the incidental impairment of First Amendment freedoms. In this case, the Commissioner must show that the statute in question is narrowly drawn because it affects free speech and the freedom of assembly.

 A court may invalidate a law as being void for vagueness for either one of two independent reasons. *See City of Chicago v. Morales*, 527 U.S. 41, 56, 119 S.Ct. 1849, 1859, 144 L.Ed.2d 67 (1999). "First, [the statute] may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; sec-

ond, it may authorize and even encourage arbitrary and discriminatory enforcement." *Id.* (citing *Kolender*, 461 U.S. at 357, 103 S.Ct. 1855). For the reasons discussed below, the court holds that the loitering statute is unconstitutionally vague because it fails to provide reasonable notice and fails to establish guidelines to prevent arbitrary and discriminatory enforcement.

1. *Reasonable Notice*

 The purpose of the fair notice requirement is to enable ordinary citizens to conform their conduct to the law. *Morales*, 527 U.S. at 58, 119 S.Ct. 1849. "It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits . . . ." *Id.* at 56, 119 S.Ct. 1849 (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03, 86 S.Ct. 518, 520, 15 L.Ed.2d 447 (1966)). In this case, Virginia Code § 46.2–930 prohibits "loitering" on any bridge designated by the Transportation Commissioner. As established by this court in its previous opinion granting a preliminary injunction, loitering is defined by Webster's Dictionary as "to delay an activity with aimless idle stops and pauses; to remain in an area for no obvious reason; to lag behind." Webster's Dictionary (10th ed.1997). The infirmity with this type of prohibition is that it fails to distinguish between innocent conduct and conduct calculated to cause harm and "makes criminal activities which by modern standards are normally innocent." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 163, 92 S.Ct. 839, 844, 31 L.Ed.2d 110 (1972). Although persons of ordinary intelligence may maintain a common and accepted meaning of the word "loiter," such a term by itself is inadequate to inform a citizen of its criminal implications. For example, if a person stopped briefly

on the bridge to admire the sunset, he could be in violation of the statute. Because their idleness was for purely innocent purposes, the vast majority of individuals would not realize that their action was criminal, even with "no loitering" signs posted nearby. The statute thus fails to give adequate notice of what is prohibited.

The problem of inadequate notice is compounded by the fact that the statute does not require the police to inform the offending individual to leave the bridge or risk arrest. An individual who happens to remain on any designated bridge may be arrested without any prior warning that their conduct crossed the line into "loitering." While the police in this case did in fact instruct the Lytles to cease their activities, it was not required by the statute. Without such notice, there is no "adequate warning of the boundary between the permissible and the impermissible applications of the law." *Morales,* 527 U.S. at 59, 119 S.Ct. 1849.

Moreover, the loitering statute fails to provide adequate notice because it contains no *mens rea* requirement or any other criminal element. Modern ordinances criminalizing loitering typically require evidence of criminal intent or some other overt act. *See, e.g., People v. Ellison,* 68 Cal.App.4th 203, 80 Cal.Rptr.2d 120 (1998) (intent to commit specific offenses involving controlled substances); *City of Tacoma v. Luvene,* 118 Wash.2d 826, 827 P.2d 1374 (1992) (manifesting the purpose of engaging in drug-related activity); *People v. Smith,* 44 N.Y.2d 613, 407 N.Y.S.2d 462, 378 N.E.2d 1032 (1978) (purpose of engaging in a prostitution offense). In contrast, courts have "uniformly invalidated laws

that do not join the term 'loitering' with a second specific element of the crime." *Morales,* 527 U.S. at 57–58, 119 S.Ct. 1849. *See also, NAACP v. City of Annapolis,* 133 F.Supp.2d 795, 808 (D.Md.2001) (holding ordinance lacking *mens rea* requirement unconstitutionally vague). The present statute requires no specific conduct manifesting criminal propensity. As such, the statute's prohibition on loitering fails to provide any standard by which people can measure their conduct. *See Papachristou,* 405 U.S. at 162–63, 92 S.Ct. 839; *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971).[3] The court holds that the statute in question fails to give adequate notice to citizens that their conduct may be illegal. The statute is therefore vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Morales,* 527 U.S. at 60, 119 S.Ct. 1849 (quoting *Coates,* 402 U.S. at 614, 91 S.Ct. 1686).

### 2. *Minimum Guidelines*

■■■ A statute will be held unconstitutionally vague if it violates the "requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender,* 461 U.S. at 358, 103 S.Ct. 1855 (quoting *Goguen,* 415 U.S. at 574, 94 S.Ct. 1242). When statutory language lacks sufficient "definiteness or certainty of expression," enforcement of the law is left to the purely subjective decisions of the police, prosecutors, and juries. *Id.* at 357–58, 103 S.Ct. 1855. In this case, Virginia Code

---

**3.** The fact that the statute can only be enforced on those bridges designated by the Transportation Commissioner does not save the statute. Courts have historically invalidated loitering statutes that are limited in scope. *See, e.g., People v. Bright,* 71 N.Y.2d

376, 526 N.Y.S.2d 66, 520 N.E.2d 1355 (1988) (loitering in a transportation facility); *State v. Stilley,* 416 So.2d 928 (La.1982) (loitering within six hundred feet of any polling place); *State v. Bloss,* 62 Haw. 147, 613 P.2d 354 (1980) (loitering within a pinball arcade).

§ 46.2–930 contains no ascertainable guidelines whatsoever. The statute directs the police to arrest and/or issue a citation without first making any inquiry about an individual's possible purpose. In this respect, the statute is more egregious than the ordinance found unconstitutional in *Morales*. In *Morales*, the ordinance directed any police officer, who observed a "criminal street gang member" loitering with one or more other persons, to issue an order to disperse. *Morales*, 527 U.S. at 47, n. 2, 119 S.Ct. 1849. If the individuals disobeyed the officer's order, then they could be found guilty under the ordinance. In the present case, the statute does not require that the police inform offending individuals to leave the bridge. As long as the individual is on a bridge that has been designated by the Transportation Commissioner, the statute provides police with absolute discretion to decide what activities constitute loitering. The statute requires no harmful purpose or effect, or any other limitation. *See Id.* at 62, 119 S.Ct. 1849. The Supreme Court's opinion in *Shuttlesworth v. City of Birmingham,* offers further guidance on this point. In *Shuttlesworth,* the police arrested an individual loitering on a public sidewalk. The Court held that the statute was unconstitutional as applied to the petitioner, and would have been invalid on its face without a limiting interpretation by the state court. The Court held that literally read, the "ordinance says that a person may stand on a public sidewalk in Birmingham only at the whim of any police officer of that city. The constitutional vice of so broad a provision needs no demonstration." *Shuttlesworth,* 382 U.S. at 90, 86 S.Ct. 211. By substituting "public overpass" for "public sidewalk" in the Court's language, it is clear that the Virginia statute fails to establish minimum guidelines, especially since the Virginia state courts have not provided any limiting instructions.

The Commissioner responds that the statute does not give the police absolute discretion to enforce the statute. On the contrary, the Commissioner asserts that once the Virginia Department of Transportation designates a bridge, the police have *no* discretion and must enforce the statute against any and all loitering because Virginia Code § 46.2–930 uses the term "shall" to convey its requirements. However, the Court in *Morales* faced a nearly identical situation and held:

It is possible to read the mandatory language of the ordinance and conclude that it affords the police *no* discretion, since it speaks with the mandatory "shall." However, not even the city makes this argument, which flies in the face of common sense that all police officers must use some discretion in deciding when and where to enforce city ordinances.

*Morales,* 527 U.S. at 62, n. 32, 119 S.Ct. 1849. Thus, the Commissioner's argument is foreclosed by the *Morales* opinion. As in *Morales*, the statute here gives police too much authority and unfettered discretion, creating the "potential for arbitrarily suppressing First Amendment liberties. . . ." *Kolender,* 461 U.S. at 358, 103 S.Ct. 1855 (quoting *Shuttlesworth,* 382 U.S. at 91, 86 S.Ct. 211). The court holds that Virginia Code § 46.2–930 fails to establish sufficiently specific limits on the discretion of the police and is unconstitutionally vague. Because the court finds the statute unconstitutional on vagueness grounds, it declines to address the Lytles' other constitutional claims.

### III. THE § 1983 CLAIM

■ To prevail against the City of Norfolk on their § 1983 claim, the Lytles must establish that they were "deprived of a right secured by the Constitution or laws of the United States, and that the alleged

deprivation was committed under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 985, 143 L.Ed.2d 130 (1999).[4] The Lytles were clearly deprived of a constitutional right when they were threatened with arrest under Virginia Code § 46.2–930, a facially vague statute. Furthermore, the court held in its December, 1999 opinion that the enforcement of Virginia Code § 46.2–930 was unconstitutional *as applied* to the Lytles because the loitering statute could not apply to demonstrators engaged in protected First Amendment activity. *See Lytle v. Brewer,* 77 F.Supp.2d 730, 737–38 (E.D.Va.1999).[5] Having concluded that the plaintiffs' constitutional rights were violated, the court turns to whether the City police acted pursuant to a policy, custom, or practice, for which the City should be held liable under § 1983.

 Municipalities are not liable for all constitutional violations of their employees because there is no vicarious liability under § 1983. Instead, a municipality is subject to § 1983 liability only when "it causes such a deprivation through an official policy or custom." *Carter v. Morris,* 164 F.3d 215, 218 (4th Cir.1999). A "policy or custom" may be found through an express policy, such as written ordinances and regulations, or in the decisions of persons with "final policymaking authority." *St. Louis v. Praprotnik,* 485 U.S. 112, 123,

108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). Municipal liability may also attach through "certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." *Carter,* 164 F.3d at 218 (citing *City of Canton v. Harris,* 489 U.S. 378, 388–89, 109 S.Ct. 1197, 1204–05, 103 L.Ed.2d 412 (1989)). Finally, liability under § 1983 may be found in a "persistent and widespread" practice that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)). In their pleadings, the Lytles advance virtually every possible theory of recovery under § 1983. For the following reasons, the court finds that none of the Lytles' arguments are ultimately persuasive.

### A. City Policy

Traditional municipal policy can be found in a "statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." *Monell,* 436 U.S. at 690, 98 S.Ct. 2018. The Norfolk City Charter vests ultimate authority over the police department in the City Manager. *See* Norfolk City Charter §§ 59–60. The Lytles concede, as they must, that the City had not promulgated a formal policy with respect to protest activity on the Overpass. The Davis Memo, outlining the procedures to be used by the

---

**4.** Section 1983 provides in relevant part: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...." 42 U.S.C. § 1983.

**5.** As set forth in the court's previous opinions in this matter, demonstrations on the Overpass clearly pose a significant danger by distracting motorists driving below, and this is of great concern to the court. The court believes that the Commissioner might restrict such future demonstrations through a narrowly and properly drawn statute. However, the Commissioner may not regulate first amendment activities by simply characterizing all such activities as "loitering."

police in the event of future protests at the Overpass, was never approved by the City Manager and cannot represent formal city policy. The Lytles argue that the Davis Memo was not adopted as a formal policy because the City's organizational structure was deliberately designed to allow for the formulation of police procedures without City Manager review. The Lytles contend that the organizational structure of the City isolated the City Manager from potentially unconstitutional practices in order to shield the City from liability under § 1983. The court finds that this claim is not supported by the record. It is true that "egregious attempts by local governments to insulate themselves from liability for unconstitutional policies are precluded." *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915. However, there is no evidence that the City engaged in any attempt to purposefully insulate the City Manager from review of unconstitutional practices. In fact, the City Charter was adopted in 1918, well before the Supreme Court's decision in *Monell. See McMillian v. Monroe County, Alabama*, 520 U.S. 781, 796, 117 S.Ct. 1734, 1742, 138 L.Ed.2d 1 (1997) (holding that state provision predating *Monell* did not represent an attempt to avoid liability under § 1983).

### B. Final Policymaker

 The Lytles next argue that the Davis Memo constituted official policy because it was drafted with input from "high ranking city officials." A policy or custom need not receive "formal approval through the municipality's official decisionmaking channels to subject the municipality to liability." *Riddick v. School Bd. of the City of Portsmouth*, 238 F.3d 518, 522 (4th Cir. 2000). A municipality will become liable if the constitutional deprivation is caused by the official actions of those individuals "whose edicts or acts may fairly be said to represent official policy." *Id.* at 523 (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018). Official policy arises from decisions of individuals who "possess final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986); *see also, Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir.1987) (" '[P]olicymaking authority' implies authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government."). Whether an official has sufficient policymaking authority is a question of state law. *See Praprotnik*, 485 U.S. at 124, 108 S.Ct. 915. As stated above, the Norfolk City Charter provides that the City Manager, acting as the director of public safety, is in charge of the police department. *See Norfolk City Charter* §§ 59-60. Furthermore, pursuant to the Norfolk City Code, the City Manager acts as the director of public safety. *See Norfolk City Code* § 2-33.1. Thus, the City Manager is clearly the final policymaker for purposes of § 1983 liability. Under established precedent, the unauthorized actions of Lt. Brewer, Captain Chamberlain, or other "high ranking" officials cannot establish official policy. *See Praprotnik*, 485 U.S. at 125, n. 2, 108 S.Ct. 915 (holding that "official policies can only be adopted by those legally charged with doing so").

 It is undisputed that the City Manager was unaware of the Davis Memo or the previous protests on the Overpass. The Lytles attempt to overcome this fact by alleging that the City Manager implicitly delegated his final policymaking authority to division commanders such as Captain Chamberlain. While Captain Chamberlain was the immediate supervisor of Lt. Brewer and Lt. Davis, she was not the final policymaker for the police department,

much less for the City in general. Captain Chamberlain's decisions were always subject to review by the Assistant Chief of Police or the Chief of Police. The events following the July 16, 1999 incident provide convincing evidence of this fact. On August 3, 1999, the Chief of Police issued a memo to the entire police department directing that officers were not to enforce Virginia Code § 46.2–930. This memo effectively overruled the contents of the Davis Memo. Since that time, over forty protests have occurred at the Overpass without police interference. Clearly, Captain Chamberlain's authority was subservient to the Chief of Police. *See Donaggio v. Arlington County, Virginia,* 880 F.Supp. 446, 462 (E.D.Va.1995) ("Decisions in this circuit are divided as to whether a police chief or sheriff is a policymaker for § 1983 purposes, but none suggests that lower police officials have such authority."). Even if Captain Chamberlain's decisions with respect to the Overpass were "final," they "could only be considered an episodic exercise of discretion in an operational detail of municipal government, and not an exercise of delegated authority to establish and directly implement overall City policy." *Mikels v. City of Durham,* 183 F.3d 323, 335 (4th Cir.1999). Captain Chamberlain's actions were plainly not official policy, and cannot form the basis for municipal liability under § 1983.[6]

## C. *Custom or Practice*

The Lytles next contend that they were injured by an unconstitutional custom or practice of the City. Outside of "formal decisionmaking channels, a municipal custom may arise if a practice is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." *Carter,* 164 F.3d at 218 (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. 2018) (internal quotations omitted). It is well settled that isolated incidents of unconstitutional conduct by subordinate employees are not sufficient to establish a "custom" for § 1983 purposes. *See Carter,* 164 F.3d at 220 (stating that "meager history of isolated incidents" does not approach the "widespread and permanent practice necessary to establish municipal custom"); *Kopf v. Wing,* 942 F.2d 265, 269 (4th Cir.1991) (holding that custom or practice claims require proof of "numerous instances" of unconstitutional conduct); *Milligan v. City of Newport News,* 743 F.2d 227, 230 (4th Cir.1984) (holding that municipal policy or custom cannot arise from isolated constitutional deprivations by municipal employees). In this case, the plaintiffs can only point to two prior incidents where the police responded to pro-

---

6. The Lytles appear to argue in the alternative that Deputy City Attorney Foreman should be attributed with final policymaking authority because he approved the procedures contained in the Davis Memo. The Lytles point to evidence that a very high percentage of proposals approved by the City Attorney's office were adopted as policies. *See* Pl. Br. in Support, Ex. Y, pp. 17–18. As the defendants correctly point out, the fact that a "high percentage" of recommendations were followed necessarily implies that their advice was occasionally rejected. *See Hollingsworth v. Hill,* 110 F.3d 733, 744 (10th Cir.1997). The evidence does not support the conclusion that the Chief of Police or the City Manager were required to follow the advice of the City Attorney. In fact, the evidence suggests the contrary result. The actions of the City Attorney merely represented another step in the process to establish final city policy, which was only achieved with the approval of the City Manager. *See Riddick,* 238 F.3d at 523 ("When a municipal official's discretionary action is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies."). The court holds that Deputy City Attorney Foreman did not possess "final policymaking authority," and his actions did not constitute official municipal policy.

tests on the Overpass. Police involvement in the two previous incidents was not known to the City Manager, the Assistant City Manager supervising the Police Department, or the Chief of Police until after the incident that gave rise to the present suit. Plaintiffs have not presented any evidence of police interference with other protests or demonstrations in any other part of the City at any time in the history of the Norfolk Police Department prior to July 16, 1999. There is also no evidence that Virginia Code § 46.2–930 was ever enforced by any Norfolk police officer at any time prior to July 16, 1999, or any time since. The only other evidence of custom or practice are the instructions in the Davis Memo. Again, the contents of the Davis Memo were not known to any official with final policymaking authority. Further, there is no evidence that the police within the Second Patrol Division ever read the Davis Memo. Significantly, Lt. Brewer, who eventually implemented the instructions in the Davis Memo, had never read the memo until it was given to him by Captain Chamberlain immediately prior to the incident on July 16, 1999. If the "well settled" practice of the Norfolk police to order protestors to cease their demonstrations was both "widespread and permanent," it seems likely that Lt. Brewer would have at least known about such a practice. The court finds that two isolated incidents, combined with a little known memo discussing an obscure statute, can-

not approach the "widespread and permanent" practice necessary to establish a municipal custom. *See Carter*, 164 F.3d at 219 (holding that two prior incidents of unlawful conduct represents "exceedingly thin gruel" for municipal liability); *see also, Neiswonger v. Hennessey*, 89 F.Supp.2d 766, 777 (N.D.W.Va.2000) (two prior incidents insufficient).[7]

### D. Failure to Train

■ Plaintiffs further allege that their harm was caused by the City's failure to properly train its police officers. An "inadequate training" claim can form the basis for § 1983 liability only in "limited circumstances." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 1390, 137 L.Ed.2d 626 (1997). Inadequate police training can only be actionable under § 1983 "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388, 109 S.Ct. 1197. Moreover, for liability to attach, "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 391, 109 S.Ct. 1197. Such a deficiency must be shown by a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.* at 385, 109 S.Ct. 1197.

■ In this case, the City freely admits that Norfolk police officers were not

---

**7.** The Lytles further claim that the City has since ratified the practice of excluding demonstrators on the Overpass because it failed to properly discourage the practice. This claim is wholly without merit. To prove ratification, a plaintiff must show that the "authorized policymakers approve a subordinate's decision and the basis for it." *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915. As previously noted, the Chief of Police specifically directed that officers were not to enforce Virginia Code § 46.2–930. Following the Chief's di-

rections, over forty demonstrations have occurred without interference from the police. Neither the City Manager nor the Chief of Police have explicitly or implicitly approved of the actions taken by the Norfolk police on July 16, 1999. Accordingly, the court finds that the City has not ratified any unlawful custom or practice. *See Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir.1999) (ratification requires knowledge of the constitutional violation).

instructed on the constitutional rights of individuals to protest on pedestrian overpasses crossing interstate highways. Similarly, the City did not provide training to all Norfolk police officers regarding loitering laws in general, or Virginia Code § 46.2–930 in particular. While it is undisputed that the City did not train its officers in these narrow subjects, it does not follow that the City is automatically liable for the plaintiffs' injuries. Rather, "municipal liability for a failure to train may be proper where it can be shown that *policymakers* were aware of, and acquiesced in, a pattern of constitutional violations." *Canton*, 489 U.S. at 397, 109 S.Ct. 1197 (O'Connor, J. concurring in part and dissenting in part) (emphasis added); *see also, Brown*, 520 U.S. at 407, 117 S.Ct. 1382 ("If a program does not prevent constitutional violations, municipal *decisionmakers* may eventually be put on notice that a new program is called for.") (emphasis added). It is undisputed that the City Manager, the City's final policymaker, was not aware of any constitutional violations committed against protestors by the Norfolk Police Department. Nor can the City Manager be attributed with constructive knowledge of any unlawful activity. The Lytles point to only two prior instances of arguably unlawful interferences with demonstrators. This "meager" history does not approach the pattern of tortious conduct necessary to put the City's final policymakers on notice that additional training was needed. *See Carter*, 164 F.3d at 219–20. Even if the City provided additional training, the plaintiffs completely fail to establish how such training would have equipped officers to properly analyze the complex constitutional questions presented by this case. Thus, the plaintiffs have failed to prove the necessary causal link between the City's training and the plaintiffs' constitutional deprivation. *See Canton*, 489 U.S. at 385, 109 S.Ct. 1197.

Finally, the plaintiffs argue that the single application of Virginia Code § 46.2–930 is sufficient to establish liability under § 1983. Under Supreme Court precedent, "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Brown*, 520 U.S. at 409, 117 S.Ct. 1382 (citing *Canton*, 489 U.S. at 390, and n. 10, 109 S.Ct. 1197). Relief under this theory is only available in a "narrow range of circumstances" and must meet a "stringent standard of fault." *Id.* at 409–10, 117 S.Ct. 1382. The evidence in this case clearly establishes that the statute in question was never enforced at any time prior to July 16, 1999. Subordinate officers in the Second Patrol Division only discovered its existence through extensive research. The Davis Memo, the only document suggesting that police apply this obscure statute, was never disclosed to the City Manager. As such, there is no way that the City's final policymaker could have known that the statute's use was "highly predictable." *Id.* at 409, 109 S.Ct. 1197. The court holds that the need for training was not so "plainly obvious" that the failure to instruct on Virginia Code § 46.2–930 can be said to be deliberately indifferent. *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000).

In summary, the court concludes that the City of Norfolk is entitled to a judgment as a matter of law on the Lytles' § 1983 claim because the plaintiffs failed to establish that any deprivation of their federal rights was caused by an official policy or custom of the City.

### CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment is

GRANTED in part and DENIED in part. The Commissioner's motion for summary judgment is DENIED, and the City of Norfolk's motion for summary judgment is GRANTED.

The Clerk is DIRECTED to send a copy of this Order to all counsel of record.

It is so ORDERED.