**Byron B. SIMMS, as Guardian and Next Friend of Christopher Byron SIMMS, Plaintiff**

v.

**Janice HARDESTY, et al., Defendants**

**No. CIV. AMD 02–3506.**

United States District Court,
D. Maryland.

Aug. 27, 2003.

Timothy Francis Maloney, Steven B. Vinick, Joseph, Greenwald and Laake PA, Greenbelt, MD, for Plaintiff.

Kevin Bock Karpinski, Allen, Karpinski, Bryant and Karp PA, Baltimore, MD, Rhonda Lee Weaver, Office of Law for Prince George's County, Upper Marlboro, MD, for Defendants.

## MEMORANDUM OPINION

DAVIS, District Judge.

This is a case of profound irony. Ostensibly to "protect" Christopher Simms, a 28–year–old pre-trial detainee known to have suffered a behavior-altering brain injury years earlier, from injuring himself, a team of three correctional officers entered Simms's cell at the Prince George's County, Maryland, Detention Center in September 1998. At the time of the officers' entry into the cell, Simms was lying on his back on his bed with his hands behind his head. Over the next several moments, after Simms refused an order to get on the water-covered floor of the cell so that restraints could be applied to his wrists, and during a struggle between the three officers and Simms, Simms was rendered unconscious and suffered severely debilitating facial and head injuries. Indeed, according to one of his expert witnesses, Simms allegedly lost 13 points off his IQ as a result of the brain trauma he endured during those moments. As a result of his injuries, Simms has no recall of what happened to him during those moments in the cell with the correctional officers, each of whom has testified under oath that he did not strike, punch, or kick Simms. The issue presented is whether Simms can avoid summary judgment on his claim that the officers deprived him of his due process liberty interest in avoiding excessive force. I am persuaded that the record compels the conclusion that Simms does indeed avoid summary judgment.

### I.

Plaintiff, Byron B. Simms, filed this action as Guardian and Next Friend of his son, Christopher Simms, against Prince George's County ("the County"), and eight correctional officers employed at the Prince George's County Detention Center ("Detention Center"), in the Circuit Court for Prince George's County. Defendants timely removed the case to this court based on federal question jurisdiction. Discovery has concluded, all claims against five of the individual defendants have been voluntarily dismissed by plaintiff, and now pending is the remaining defendants' motion for summary judgment. I ordered full briefing on the federal claims (while staying the state law claims) and a hearing has been held. For the reasons set forth below, the motion for summary judgment shall be granted in part and denied in part.

### II.

A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. Anderson, 477 U.S. at 250, 106 S.Ct. 2505;

*see also Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987). The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c); *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

## III.

On or about December 31, 1991, at age 21, Simms had been involved in a motor vehicle accident in which he sustained significant brain damage. As a result of his injuries, Simms developed an impulse disorder. In the years following the automobile accident, although he was not involved in any incidents of actual violence, Simms was arrested on several occasions for impulsive behavior, including stalking and inappropriate touching of women.

On or about July 16, 1998, Simms was transferred from the Howard County, Maryland, Detention Center, where he had been held for some period of time, to the Detention Center. On July 17, 1998, employees of the Detention Center's medical contractor, Correctional Medical Services ("CMS"), performed a medical history and screening on Simms, including a mental health assessment; Simms denied any history of psychiatric hospitalization or medications. CMS personnel recorded that Simms was ."acting and/or talking in a [really] strange manner" and that Simms was on medications for a prior auto accident.

On July 19, 1998, Simms was referred for psychological services because he was disoriented and confused, following correctional officers around asking where he should go and what he should do. Ben Yue, the psychiatric associate at the Detention Center, described Simms as quiet and timid, and noted that Simms would walk up to people and ask if they had called to him. On July 21, 1998, Yue spoke by telephone with Byron Simms to obtain Simms's psychological history. Byron Simms informed Yue that his son had been in a serious motor vehicle accident in 1991 and that he had an impulse disorder as a result, for which he took a prescription medications, Tegretol and Paxil/Risperdal. Yue noted that he would obtain Simms's medical records from Howard County. Yue faxed a medical release authorization to Howard County to obtain Simms' medical records. Thereafter, Yue ordered that Simms be placed in Housing Unit 11B, a special unit at the Detention Center used to house mentally ill inmates, other inmates with disabilities, and inmates who need to be heavily medicated. Yue also directed that Simms should be seen by Dr. White, the Detention Center's psychiatrist. Later that day, Simms was following people around and generally irritating fellow inmates. He was placed in an isolation cell for observation.

On July 25, 1998, Simms was seen by Dr. White. Dr. White noted that Simms appeared disheveled, his speech was soft, and his mood affected. Dr. White noted a possible "schizoaffective" disorder and that Simms seemed depressed. He ordered that Simms be placed on Paxil, Trilafon and Cogentin. Dr. White also ordered follow up visits with the doctor and social worker. Apparently, Simms's stay at the Detention Center between the end of July through early September was relatively uneventful, although, on September 7, 1998, Dr. White modified Simms's medications because he was having difficulty on the unit by going into other people's belongings. Also, Simms had been locked down two times for this behavior. On September 9, 1998, Yue noted that Simms had a "silly mood."

Officer Hardesty was the Housing Unit Officer in Unit 11B on September 11, 1998, and worked the 7:00 a.m. to 3:00 p.m. shift. When Hardesty arrived at work that

morning, she was informed by Corporal Blackman, the Housing Unit Officer for 11B on the previous shift, that Simms had been very disruptive during the night, making a lot of noise and keeping the other prisoners awake. Prior to that day, Hardesty had had no contact with Simms.

That morning, during "lock down" (the period during which all prisoners must remain in their cells, particularly during a shift change), Hardesty noticed that Simms had thrown water out of the food slot in his cell door. From the officers' desk about 15 feet across from Simms's cell, Hardesty ordered Simms to stop throwing water out of his cell. Simms continued to throw water out of his cell door. Thus, Hardesty, called her Zone Commander, Sergeant Doukas, to request that the water in Simms's cell be turned off. Doukas requested a maintenance person to shut off the water in Simms's cell. The plumbing controls for each cell are located inside the cell.

Officer Hardesty asked Simms to step away from the door to permit one of the maintenance employees ("Fish") to enter to shut off his water. When Hardesty opened Simms's cell door to allow Fish to enter, Simms pushed Hardesty and Fish out of the way, ran out of his cell and began running around the nearby day room. Simms refused Hardesty's order to return to his cell. Fish turned off the water in Simms's cell and then went to the desk area and waited with Hardesty. Hardesty called Doukas and informed him of the situation. Doukas arrived at Unit 11B within about two to three minutes and attempted unsuccessfully to talk Simms back into his cell, but Simms continued to run around the Unit.

Doukas called out a "Signal Three," a non-emergency signal, for members of the Emergency Response Team ("ERT") to respond to Unit 11B. A "Signal Three" is a low-level response call made in a case where there is "no security risk." The ERT "basically are first responders [that] help quell any incidents, assist the correctional officers. They respond to any type of emergency, an officer in trouble, a disturbance in a housing unit, and they're trained as a team to go in and assist in quelling those situations." *See* Pl.'s Ex. 8, at 5, 9–10. ERT members receive a "basic" two to four hour psychology class to prepare them for situations with mentally ill inmates. No policy on training exists with regard to the amount of force that should be used with mentally ill inmates or on communicating with or specifically treating mentally ill inmates. With regard to the use of force, all officers, including the ERT members, are instructed to treat inmates with mental disabilities "the same as any other individual."

ERT members Corporal Roberts, Corporal Mack, Corporal Lyles, Corporal Bruce, Sergeant Carrol and Corporal Ducellier each arrived at Unit 11B in response to the "Signal Three" and were informed that Simms refused to be locked down. ERT members lined up outside the door to Unit 11B. The ERT members walked into Unit 11B in a column and the point person, Corporal Roberts, ordered Simms to lay down on the floor and place his hands behind his back. According to the officers, Simms did not obey the order and, instead, he began walking towards the ERT members, cursing and yelling. Simms was again ordered to get down on the floor, but he ignored the order and continued walking towards the ERT members. Thus, Officers Roberts and Mack went "hands-on" and used an "arm bar" take down maneuver to take Simms to the floor, while Simms resisted by refusing to place his arms behind his back and by pushing upwards to stand up. Mack used a pressure point technique to restrain

Simms. Simms did not respond to this technique and continued to resist by thrashing about and pushing off from the floor. Simms grunted and growled at the officers, who eventually overpowered Simms and got his arms behind his back and handcuffed him. None of the ERT officers hit, kicked or struck Simms during the incident. As a result of the incident, Sergeant Doukas ordered Simms's reclassification and reassignment to Unit H–5, a disciplinary unit in the Detention Center.

Once Simms was secured in handcuffs, Roberts and Mack picked him up and the ERT members escorted Simms out of 11–B and took him to the medical unit where a nurse attended to Simms. The nurse treated Simms with Betadine (iodine) for carpet burns to his forehead, which he suffered in 11B while thrashing about. After being cleared by the nurse, Simms was taken to Unit H–5. Pursuant to normal procedure, Simms was strip searched and then placed in cell 215 in Unit H–5 without incident. Officer Lyles found Simms to be "very cooperative" after being removed from his cell in 11–B. The log book for Unit 11–B on September 11, 1998, notes that Simms was "locked down for 72 hrs. for throwing water outside his cell door" and that he had been "[reclassified] to H–5." An order issued providing that the water in Simms's cell (cell 215) was to be turned off.

Coincidentally, within a few minutes after Simms was placed in cell 215 in Unit H–5, he had visitors. Lyles and another officer walked Simms to the visitor "contact" booth; Simms was cooperative and the officers did not have to place handcuffs on him to transport him. Simms's visitors were Dr. Mason Scott of Developmental Service Group, Inc., and two of his colleagues. Dr. Scott prepared a "consultative note" regarding his visit with Simms. According to Dr. Scott's note, Simms had "what appeared to be a fresh bruise on the left frontal region of the forehead" and a "slightly swollen" left eye, which Simms reported was due to an altercation with the guards, but he had no serious injuries of any kind as a result of the incident moments earlier. After the visit, Simms was escorted back to his cell without incident.

Later, at about mid-day on September 11, 1998, while Corporal France–Troupe was performing her duties, Simms whispered to France–Troupe to "come here." When she approached the cell, Simms whispered, "I want to come out." When France–Troupe told Simms he was not allowed out of his cell, Simms called her a "black bitch[ ]" and began kicking and banging on his cell door, in a profanity-laced tirade. The officer notified her zone commander, Sergeant Stewart, that Simms was unruly and banging on his cell door, and that water was coming from under the cell door. Stewart authorized the use of restraints to prevent Simms from harming himself.

Meanwhile, at approximately 11:30 a.m., the ERT had received a "Signal 13" (officer being attacked) in the Medical Unit. In a cell near the Medical Unit, another detainee, Thomas Williams, had attacked Correctional Officer Ducellier while Williams was waiting to be seen by a doctor. ERT members Mack, Bruce and Lyles responded and pulled Williams off of Officer Ducellier, restrained him in handcuffs, and took him to the nurse's area to be examined. They then returned Williams to his cell on the first floor of Unit H–5. As the officers entered H–5 to return Williams to his cell, they could hear banging and kicking coming from the second floor of the Unit. Corporal France–Troupe informed Officers Mack, Bruce and Lyles that Simms was banging and kicking in his cell or on his cell door and refused to stop. France–Troupe also advised the of-

ficers that she had just spoken with Sergeant Stewart and he had authorized the use of restraints, i.e., waist chains, handcuffs, and leg irons. Lyles, who was the senior officer in charge of the ERT team, testified that it is normal procedure to restrain a detainee who is kicking and banging in his cell in order to keep him from harming himself. It is undisputed that at no time did any correctional officer see or hear Simms banging his head against a door or wall or otherwise engage in any actions posing a risk of harm to Simms. France–Troupe simply described Simms as "unruly."

Officers Bruce, Lyles and Mack obtained waist chains and leg irons from the control desk at H–5 and then proceeded up the stairs to the second floor to cell 215. Approximately five to ten seconds before they arrived at cell 215, the banging and kicking stopped. As the officers approached the doorway to cell 215, they saw water coming out from under the door. Apparently, although the water supply in cell 215 had been shut off before Simms was transferred, Simms splashed the little water that remained inside the toilet onto the cell floor and underneath and outside of the cell door. As a result of the permanent injuries Simms suffered in the ensuing encounter, he has no recollection of the following events. Thus, the following account of the events in cell 215 is based solely on the defendants' testimony.

Cell 215 had a sink, a toilet and a metal desk to the right of the doorway and a bunk bed against the wall directly across from the doorway. The only way to see into a cell is through the window in the door. The window is approximately eight inches by five inches wide. Bruce looked through the window into cell 215 and advised the other officers that Simms was sitting or lying on his bunk bed and that there was water on the floor. Bruce ordered Simms several times to get on the floor and place his hands behind his back. Simms remained on his bunk. Corporal Lyles, the team leader, then gave the order for them to enter the cell.

Mack opened the cell door. Bruce was the first officer to enter the cell. Simms continued to refuse to go to the floor; he was lying on the bunk, passively, face up with his hands behind his head. Bruce approached Simms and attempted to pull him off the bunk and place him onto the floor, using the arm-bar technique. Simms resisted and, thereafter, a struggle ensued. Officer Bruce slipped on the water on the floor of the cell. Mack, Lyles and Bruce then allege that Bruce caught himself on the sink. Simms, who was by then off the bed, grabbed Bruce's leg and began to bite Bruce's boot at his ankle. Simms also allegedly grabbed and pulled Mack's hand toward his mouth in order to bite it.

Lyles entered the cell and attempted to pull Simms away from Bruce and then away from Mack's arm and hand. Lyles grabbed Simms's orange prison suit near the shoulder as Lyles slipped on the wet floor. Mack and Lyles attempted to take Simms down to the floor and place his arms behind his back to handcuff him. Simms continued to resist and to thrash about; eventually, he got back to his feet. The officers also got back to their feet. The officers tried to place Simms up against the wall on the left side of the cell to stabilize his body and tried to get his arms behind his back, but Simms continued to resist. All of them spun around and ended up back on the floor struggling. When they went to the ground, Simms first fell to his knees and then down to his chest to the floor. During the struggle, Mack was attempting to get his handcuffs out of his pocket and Simms was thrashing around with his arms and trying to push

up off of the floor. Mack applied the pressure point technique, but it had no effect on Simms. Bruce attempted to hold Simms's legs down so he could not get off of the floor. Lyles was attempting to restrain Simms's arms and get his arms behind his back. The water in the cell and Simms's thrashing about made it difficult to get a grip on Simms's arms and control him.

After some time, Simms suddenly stopped struggling and the officers were able to pull his arms behind him and place handcuffs on him. Mack, Lyles and Bruce attest that at no time did either of them hit, kick or punch Simms during the incident.

Once Simms was handcuffed, the officers noticed blood on the floor and realized that Simms was bleeding from the bridge of his nose. Simms was unconscious and unresponsive at this point. Mack, Lyles and Bruce immediately lifted Simms, with one officer supporting each arm and his head and another officer carrying his legs, and moved Simms just outside his cell due to the wet floor so that Simms could receive medical treatment. The officers laid Simms down and propped him slightly to the side so that no blood would flow into his airway. Corporal Lyles called out a Signal 89 (medical emergency) and nurses Janet Levin and Pamela McNicol soon arrived. Sergeant Carroll arrived just before the nurses. The Log Book shows that the Signal 89 was called out at 11:45 a.m.

The nurses assessed Simms's condition and wiped the blood from his face. Nurse McNicol, the on duty-nurse, and Nurse Levin arrived and found Simms face down with blood around his face and head. Simms was unresponsive to verbal commands, injured on his left orbital region, and the left side of his head suffered from "forceful blunt head and facial trauma." McNicol was not aware of any injuries

suffered by Officers Lyle, Mack, and Bruce.

Corporal Lyles retrieved a stretcher and Simms was loaded onto the stretcher and taken to the medical unit, where he "came to." The Log Book for Unit H–5 shows that Simms was taken out to the Medical Unit at noon. Simms was evaluated and treated by Dr. Nwasu and then transported to Prince George's County Hospital by Sergeant Bybee.

Simms was admitted to Prince George's Hospital Center on September 11, 1998, and he was discharged on September 28, 1998. In addition to the black eyes, abrasions, fractures to the left orbital floor and the nasal bone, Simms suffered the following injuries to his brain: subdural hematoma or hematomas, subarachnoid brain hemorrhage, a hydrocephalus, cerebral atrophy and ventricular dilatation, a subdural hygroma, and intracerebral blood collection.

Simms contends that the circumstantial evidence in the record, and most particularly the expert medical evidence and its attendant impeaching effect on the account given by the defendants of the character of the force used against Simms in cell 215, would permit a reasonable fact finder to conclude by a preponderance of the evidence that he was subjected to a severe beating with fists, booted feet, and perhaps a baton, and/or that his head was thrust violently into or against the steel toilet bowl that was present in cell 215 at the time of his struggle with the officers. There follows a summary of the evidence relied on by Simms in support of his claim that he was the victim of such force that his claim rises to the level of a due process violation. Charles Key, Sr., ("Key"), Simms's "Use of Force Expert," states in his affidavit that the severity of the injuries Simms suffered amounted to a use of lethal force by any standard. Key attests

that the circumlinear bruise on Simms's head reflected a pattern injury and indicated that Simms head had struck something with a rounded surface in the cell. "Given the angular nature of the rest of the inside of the cell, the injury to his head could only have been caused by the rounded inside of the toilet. Hitting his head on the outside of the toilet would possibly have caused contusions and abrasions, but the resulting injury would not have had the 'horseshoe' effect shown in the photograph."

Dr. Citrin, a neuroradiologist, stated one of Simms's injuries was "linear" and "all one bruise" that it "look[ed] like he almost had a bowl or something stuck on his head or twisted [but that] [i]t's not an injury you can give yourself." Dr. Citrin attests to a reasonable degree of medical certainty that Simms's injuries are wholly inconsistent with the version of the encounter given by the members of the ERT team.

According to Dr. David Katz, the injuries sustained by Simms from this incident show that he suffered "significant trauma" to his face, to the orbital floor left eye, and "multiple cranial facial injuries that are inconsistent with subduing someone on the floor or someone self-inflicting an injury," and that "multiple blunt trauma to the head and the globe causing multiple intracranial hemorrhages in an orbital blowout fracture" had occurred. In particular, with regard to the injury around Simms' eye socket, Dr. Katz described the amount of force required as "a tennis ball [being] served hitting me flush in the eye to do it. [A] lob hitting [someone] in the eye, for example, would not do it."

Dr. Tavacoli, a treating physician at the hospital, recorded that the officer who delivered Simms to the hospital not long after the incident reported that Simms had been "beaten on the face" ("[p]er officer, [patient] was being transferred and tried to bite an officers [sic] arm—officer used his fists—multiple blows—to subdue [patient]"); *see also* Pl.'s Ex. 17 (History & Physical, Sept. 11, 1998) (stating that "28y/o WM sent from the jail after beaten on the face while he was trying to bite the officer .... The officer used fists multiple blows while trying to subdue the [patient]").

According to Dr. Andrew Panagos, another treating physician, Simms suffered a cut to his nose, and a "very flat surface [such as a wall] typically will not cause a cut to that area." Rather, Dr. Panagos stated, "[u]sually some type of object has to strike you in the bridge of the nose ... either from a fist or a foot or a baton or a blow against a piece of furniture that has a ridge on it, like edge of toilet bowl or bunk bed [sic] that has a metal edge to it or something."

Plaintiff also showed "radiographic evidence of a subdural hematoma, parietal lobe contusion with blood that was dissecting into the subarachnoid space associated with the fractures of the inferior orbit on the left." These are considered "pretty significant" injuries "that indicate [Simms] received a pretty severe blow to the face and head." Moreover, Simms sustained an injury to the interior orbit of his face due to the altercation in H–5. This injury could not have come from contact with a wall or the floor. Instead, this injury was consistent with an altercation with other people who hit with fists, batons, or some other object. According to Dr. Andrew McCarthy, all of Simms's injuries were "impossible to administer to yourself."

A review of brain scans prior to and subsequent to the September 11, 1998, incident showed that Simms incurred at least three new areas of hemorrhaging in his brain. This damage was so severe that, when Simms's treating psychiatrist, Dr. Helen Lann, called the hospital to

speak with Simms' treating physician, the physician stated that he had "never seen anybody come in like this. I get cases coming in from prison all of the time. I have never seen anybody in this bad of condition. He really, you know, was beaten badly."

Simms was confused and disoriented during his two and half week stay in the hospital, having problems ascertaining who he was, where he was, and what time period he was in. As of September 17, 1998, six days after the incident, Plaintiff did not follow any commands, could only open "his eyes briefly to stimulation," and had "[n]o spontaneous movement of the extremities . . . ." Plaintiff could not communicate with other people, respond to verbal commands, or eat by himself until approximately two weeks after the September 11, 2003 beating. Plaintiff was diagnosed with "severe cognitive-linguistic deficits characterized by delayed auditory processing, decreased verbal expression and initiation and attention."

Simms's intelligence quotient was significantly less than before the September 11 incident. Simms's IQ before September of 1998 of 100 had diminished to 83. In sessions with Dr. Panagos previous to the September 11, 1998 incident, Simms was able to remember words given to him by the doctor. However, his cognitive functions had been so damaged from the attack that, even with prompting and when given queues, Simms could no longer remember any words given to him after a five minute period. Simms had also lost the ability to think abstractly. Simms is now a concrete thinker who does not understand abstract concepts such as proverbs. Moreover, Simms will never be able to work unsupervised again. "You couldn't give him a task and come back 15 minutes later and say, "Chris, what did you do?" It wouldn't get done. That's the "biggest difference that I

see." Dr. Lann also stated that "there was a marked difference in his cognition, and his ability to interact, speak, his interpersonal, his being there. He looked more brain damaged."

Prior to the September 11, 1998 incident, Plaintiff had good long-term memory, "reasonably good" insight, was able to drive, and had held a job at United Parcel Service. Simms was self-sufficient in many respects and certainly did not require twenty-four hour care. For instance, he could do his own food shopping. After the assault, he lost the ability to walk properly, "all of the feistiness was gone[,]" he could not remember what he did earlier in the morning, and "his memory was just shot." In fact, Dr. Lann explained the difference in Plaintiff's memory as:

> so bad now [that] [i]f Chris wrote things down, I don't think he would remember he wrote them down to look at. Before, he might know to take a list to check what he had to do. If you sat in your office and made up a list and said 'Look at this throughout the day,' I don't think two hours later her would remember there was something he was supposed to take out to look at. That is the difference.

Plaintiff also had no "working memory," resulting in a difficult time remembering anything for any significant period of time. "A good example of working memory is you look up a phone number, and you go to the telephone, and someone interprets you for a second. With him, it is gone, absolutely gone, or the ability to hold one thing in mind while you are doing something else. He has no capacity to do that." In this respect, "[h]is learning curve [will continue to be] shallow, and his retention minimal," and it is "unlikely that [Simms] will be able to engage in gainful employment in the foreseeable future."

## IV.

Simms has asserted three federal constitutional claims pursuant to 42 U.S.C. § 1983:(1) a Fourteenth Amendment excessive force claim; (2) a First Amendment freedom of speech claim; and (3) a two-pronged *Monell* claim: namely, one theory based on the County's failure to train correctional officers in the use of force, and one theory based on the County's failure to train correctional officers in the proper screening and safeguarding of mentally ill inmates. For the reasons stated below, I shall deny the motion as to the excessive force claim and otherwise grant the motion.

## A.

■ First, Simms alleges that the officers used excessive force against him and that the quantum of force employed, in light of the manifest purpose of the use of force, coupled with the nature and character of his injuries, brings his claim well within the parameters of a cognizable constitutional violation that must be submitted to the jury. Defendants contend that this claim fails as a matter of law, both because there is insufficient evidence to satisfy the requirements of a Fourteenth Amendment excessive force claim, and also because, in any event, they are entitled to qualified immunity.

The proper analytical approach in cases such as this one was recently reiterated by the Fourth Circuit in *Jones v. Buchanan,* 325 F.3d 520 (4th Cir.2003):

In excessive force cases, entitlement to qualified immunity must be analyzed in two steps, which are to be "considered in proper sequence." The "threshold question" requires a court to resolve the issue [of] ... whether, "taken in the light most favorable to the party asserting the injury, ... the facts alleged show [that] the officer's conduct violated

a constitutional right." "If no constitutional right would have been violated," even when the facts are viewed in the best light for the injured plaintiff, the analysis ends; the plaintiff cannot prevail.

However, if, taking the allegations or evidence (depending on the procedural posture of the case) in the best light for the plaintiff, the plaintiff has stated a violation of a constitutional right, we proceed to the second step. "The next, sequential step is to ask whether the right was clearly established" at the time of the events at issue. If not, the qualified immunity doctrine still provides a defendant officer with immunity from suit. If so, summary judgment must be denied.

Therefore, in order ... to defeat the defendants' motion for summary judgment, (1) [plaintiff] must have stated the violation of a constitutional right, and (2) that right must have been clearly established at the time he suffered his injuries ....

*Id.* at 526–27 (citations omitted). Furthermore, in assessing the issue of whether Simms has "stated [and adequately supported by admissible evidence] the violation of [his] constitutional right [to be free of excessive force as a pre-trial detainee]," the relevant legal standards were recently articulated by the Fourth Circuit in *Robles v. Prince George's County,* 302 F.3d 262, 269 (4th Cir.), *reh'g and reh'g en banc denied,* 308 F.3d 437 (4th Cir.2002), *cert. denied,* 538 U.S. 945, 123 S.Ct. 1634, 155 L.Ed.2d 486 (2003). To paraphrase *Robles:*

As a pretrial detainee, [Simms's] treatment and the conditions of his restraint are evaluated under the Due Process Clause of the Fourteenth Amendment .... In order to conclude that [Simms's] rights under this clause

were violated, it is necessary to find that the officers' actions [1] amounted to punishment and [2] were not merely "an incident of some other legitimate governmental purpose ..." and that [3] the injury resulting from their actions was more than *de minimis.*

*Id.* at 269. (citations and footnote omitted). I am persuaded here that Simms has projected sufficient evidence to permit a reasonable fact finder to find by a preponderance of the evidence each of the elements of his due process excessive force claim.

First, a reasonable fact finder could reasonably conclude that the beating inflicted upon Simms "amounted to punishment" for purposes of the Fourteenth Amendment due process clause. In this regard, I deem it significant that, according to defendants' version of the events in cell 215 on September 11, 1998, they struck *no* blows. Notwithstanding this negative evidence, and notwithstanding the fact that Simms's injuries have rendered him unable to recall the events of September 11, 1998, the circumstantial evidence that Simms was severely beaten and that his head might have been bashed and battered, is ample. The circumstances include the medical testimony summarized above, coupled with the sheer magnitude of the injuries Simms suffered, together with the entries in the emergency room records indicating that an unidentified colleague of the defendants, i.e., the correctional officer who transported Simms to the hospital, reported that Simms had suffered "multiple blows" "with fists."

Of course, as mentioned above, defendants deny that any blows were struck. Nevertheless, recognizing the summary judgment standard that controls the court's assessment of the evidence, they invite the court to accept the powerful inference from the circumstantial evidence that they did indeed "[strike Simms with

their] fists, kick[ ][him] with their [booted] feet, and [that Simms] had his head bashed into or with other objects in the cell [by them]," and contend that, *nevertheless, this evidence fails to satisfy the due process test of "punishment."* (Emphasis added). *See* Defendants' Reply Memorandum at 7 n. 5 ("[E]ven accepting these assertions as true, they nevertheless fail to establish that his injuries were inflicted wantonly and sadistically for the purpose of inflicting harm rather than a good faith effort to restore order and that it was the amount of force necessary to subdue Plaintiff"). I disagree.

To be sure, defendants' contentions in these regards rest heavily on their assertion that, in beating Simms to the point of unconsciousness, the ERT team was engaged in an effort to "restore discipline and order." *See* Defendants' Memorandum in Support of Motion for Summary Judgment at 19. But it must be recalled that at the moment of the ERT team's engagement with Simms, Simms was lying on his bunk, on his back, with his hands folded behind his head. More tellingly still is the fact that, when the officer who requested assistance from her "zone commander" because Simms, a detainee of two months tenure at the Detention Center known to engage in inappropriate but nonviolent behavior as a result of a seven-year-old brain injury incurred in a motor vehicle accident, *the zone commander only authorized action needed to prevent Simms from harming himself because he was being "unruly."* Demonstrably, therefore, the record reflects no need whatsoever for a restoration of "discipline or order" in cell 215 or in the housing unit as those terms have been employed by the Fourth Circuit and other courts. *Cf. Stanley v. Hejirika,* 134 F.3d 629 (4th Cir.1998) (force used against leader of prison rebellion in putting down rebellion and restor-

ing order). *See Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)(noting that following factors may be relevant, depending on the circumstances, in assessing whether a particular use of force might exceed constitutional boundaries: (i) the need for application of force; (ii) the relationship between that need and the amount of force used; (iii) the threat "reasonably perceived by the responsible officials," and (iv) "any efforts made to temper the severity of a forceful response.") (citations omitted)(Eighth Amendment case).

The next issue under *Robles* is whether the officers' actions were merely "an incident of some other legitimate governmental purpose." The discussion above largely disposes of this issue as well. A reasonable fact finder could reasonably conclude on this record that the members of the ERT team have given something other than an accurate account of the amount and type of force that was used to subdue Simms. Accordingly, such a reasonable juror could reasonably conclude that while some amount of force surely would have been incidental to a genuine need to "protect" Simms from causing harm to himself, the amount of force employed here well exceeded that which would have been incidental to effecting that undoubtedly legitimate purpose. This is not a case such as *Bozeman v. Orum,* 199 F.Supp.2d 1216 (M.D.Ala.2002), in which a seemingly deranged detainee died of asphyxiation from the officers' use of control techniques. The facts here, viewed in the light most favorable to Simms, reasonably support the inference that Simms was beaten and kicked into submission by officers just returning from combat with another inmate, and at a time when he was lying on his bunk with his hands behind his back, after a report that a supervisory officer, having been told that Simms had been "unruly," had concluded that he might have posed a danger to himself. The inference on this record of defendants' "punitive intent" is not arbitrary or specious. *Cf. United States v. Cobb,* 905 F.2d 784, 789 (4th Cir.1990)("the punitive intent behind a defendant's use of force may be inferred when the force is "not reasonably related to a legitimate non-punitive governmental objective .... *Thus, the task of this instruction was to convey to the jury that punitive intent on the part of defendants could be inferred from the circumstances of the assault ....* ")(emphasis added), *cert. denied sub nom. Hatcher v. United States,* 498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991)(criminal prosecution under 18 U.S.C. § 242). *See United States v. Mohr,* 318 F.3d 613, 624 n. 5 (4th Cir.2003)("Because 18 U.S.C. § 242 is merely the criminal analog of 42 U.S.C. § 1983, and because Congress intended both statutes to apply similarly in similar situations, our civil precedents are equally persuasive in this criminal context." *United States v. Cobb,* 905 F.2d 784, 788 n. 6 (4th Cir.1990).").

Finally, the third *Robles* criterion inquires into whether "the injury resulting from [the officers'] actions was more than *de minimis.*" There can be no doubt as to this issue here. Thus, the defendants' reliance on cases involving *de minimis* injuries is misplaced.

■ For the reasons stated above, I am persuaded that, drawing all inferences in favor of Simms, he has projected sufficient evidence to establish by a preponderance of the proof that his Fourteenth Amendment due process right to be free of excessive force was violated. The question therefore arises, in determining whether the members of the ERT team are entitled to qualified immunity, whether that right was clearly established at the time of the

events at issue in September 1998. *Jones,* 325 F.3d at 526–27.

Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Saucier v. Katz,* 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)); *see also Robles,* 302 F.3d at 271–72. The Fourth Circuit has instructed as follows:

> When determining whether law enforcement officers are entitled to qualified immunity, we must (1) identify the right allegedly violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable officer would have understood that the conduct at issue violated the clearly established right. *See Smith v. Reddy,* 101 F.3d 351, 355 (4th Cir. 1996). "If the right was not clearly established at the relevant time or if a reasonable officer might not have known that his or her conduct violated that right, the officer is entitled to immunity." *Id.*

*S.P. v. City of Takoma Park,* 134 F.3d 260, 265 (4th Cir.1998). I have carefully considered the parties' competing contentions in this case, and I am persuaded, and defendants do not contend otherwise, that a pretrial detainee's right to be free from constitutionally excessive force under the Fourteenth Amendment was "clearly established" as of September 1998. *Graham v. Connor,* 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment. *See Bell v. Wolfish,* 441 U.S. 520, 535–539, 99 S.Ct. 1861, 1871–1874, 60 L.Ed.2d 447 (1979)"); *Riley v. Dorton,* 115 F.3d 1159, 1166 (4th Cir.) (en banc) ("[W]e conclude that the excessive force claims of pretrial detainees are governed by the Due Process Clause of the Fourteenth Amendment ...."), *cert. denied,* 522 U.S. 1030, 118 S.Ct. 631, 139 L.Ed.2d 611 (1997); *cf. Johnson v. Glick,* 481 F.2d 1028 (2nd Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Moreover, I am persuaded that, as of September 1998, a reasonable correctional officer would have realized that if, in response to an order that a brain-damaged, pre-trial detainee (behaving in an unruly fashion by banging on the door and walls of his cell and spilling toilet water on the floor of his cell) *should be restrained from causing harm to himself,* he or she were to use a booted foot to kick (in and about the face and head), and, contemporaneously, if he or she were to bash the face and head of such a detainee into a toilet, in carrying out that order, then such a reasonable correctional officer "would have understood that the conduct at issue violated the clearly established right" of that detainee to be free of excessive force, at least where, as a result of the kicking and bashing, severe and permanent brain damage of the magnitude shown in this record results. Accordingly, I am persuaded that qualified immunity is not available on summary judgment based on the record in this case.

### B.

█ Simms alleges that defendants violated his First Amendment free speech rights insofar as their alleged assault on him might be regarded as retaliation for Simms's complaints about the conditions of confinement at the Detention Center. *Cf. Bridges v. Russell,* 757 F.2d 1155, 1157 (11th Cir.1985) (prisoner retaliated against, *inter alia,* because he actively encouraged other inmates to sign a petition protesting defendants' actions stated claim). But this claim clearly fails as a

matter of law. The gravamen of the claim is that when Simms whispered to a correctional officer that he wanted to be allowed out of his cell and was refused, and thereupon began to "act out" by banging on the walls and door of his cell and to toss toilet water around his cell, this was First Amendment speech, i.e., that Simms was "protesting" the conditions of his confinement. I reject this theory as untenable. All that the record shows is that Simms wished to come out of his cell. There is no evidence of a "protest" or that any particular characteristic of his cell prompted the request. Thus, Simms's "unruly" behavior was neither protected speech not reasonably to be understood as protected speech. Accordingly, the First Amendment retaliation claim shall be dismissed.

### C.

There is no *respondeat superior* liability under § 1983, i.e., the County cannot be held liable under the statute simply because there exists an employer-employee relationship between it and the officers who caused Simms's injuries. *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, under *Monell* and its progeny, a municipality is subject to § 1983 liability only when a plaintiff adequately pleads and proves "the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir.1994); *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999); *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir.1987), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988).

When a policy is itself unconstitutional, in that "it directly commands or authorizes constitutional violations," a plaintiff need not independently prove that the policy caused his or her constitutional violation. *See Monell*, 436 U.S. at 661, 98 S.Ct. 2018; *Spell*, 824 F.2d at 1387–88. However, when, as in this case, there is no facially unconstitutional policy at issue, municipal liability results only if the plaintiff proves that the policy or custom alleged caused his or her constitutional violation. *Spell*, 824 F.2d at 1387. The Fourth Circuit has also determined that such a municipal policy may be found in the omissions made by policymaking officials. *Carter*, 164 F.3d at 218. Municipal custom, on the other hand, may arise when a particular practice "is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* (internal quotation marks omitted).

Simms asserts two *Monell* claims against the County. First, Simms asserts that the County failed to adequately train, supervise, and discipline its correctional officers against the use of excessive force and that this failure to train resulted in a pattern and practice of excessive force that has been employed by employees of the Detention Center. Second, Simms asserts that the County failed to train its correctional officers in the adequate screening, monitoring and safeguarding of mentally ill inmates. Simms contends that these failures to train, etc., constitute a proximate cause of Simms's injuries.

To sustain a claim of failure to train or supervise, " 'plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.' " *Solis v. Prince George's County*, 153 F.Supp.2d 793, 807 (D.Md.2001) (quoting *Carter*, 164 F.3d at 218) (citations omitted); *see Harris*, 489 U.S. at 388, 109 S.Ct. 1197. That is, "only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by

... prior cases—can a city be liable for such failure under § 1983." *Id.* at 389, 109 S.Ct. 1197; *Cain v. Rock.*, 67 F.Supp.2d 544, 549 (D.Md.1999). Judged by these standards, it is clear that the County is entitled to summary judgment.

■ First, Barry Stanton, the Director of the County Department of Corrections, testified that the County's policy requires that when a detainee enters the Detention Center, he is screened by a nurse and then classified according to his needs. Simms was screened by CMS employees and was housed in Unit 11–B, where the Detention Center houses its mentally ill inmates. Simms was observed by the prison psychiatric associate and was placed on medications by the prison psychiatrist. Simms was moved from Unit 11–B only hours before the incident in cell 215 because he was reclassified. Simms presents no evidence to the contrary and, accordingly, it is clear that, apart from any policy or practice, Simms was indeed screened and monitored by employees of the Detention Center, and that no County "policy" was a proximate cause of Simms's injuries.

■ Second, Simms undertakes to rely on evidence of an incident from 1994, in which a Detention Center detainee, Jeffrey Williams, described as a non-aggressive mentally ill person who behaved irrationally, suffered injuries to his face. The law is clear, however, that proof of a single incident of even unconstitutional activity is not sufficient to prove the existence of a municipal custom. *Spell,* 824 F.2d at 1387–88; *Semple v. City of Moundsville,* 195 F.3d 708 (4th Cir.1999); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality); *Doe v. Broderick,* 225 F.3d 440 (4th Cir.2000). Thus, the Williams incident is insufficient to advance Simms's claims.

■ Furthermore, the Detention Center has a policy on the use of force and has trained its officers, particularly the ERT officers involved in this incident, in the use of force in response to emergency situations and prison disturbances. *See* Defs.' Ex. 28, at 28–31, 37. Officers are specifically trained to use the least amount of force necessary and to follow the County's continuum of force in responding to disciplinary problems or disturbances. Simms has projected no evidence of inadequacies in the correctional facilities training program regarding the use of excessive force during prison disturbances. To serve as a basis for liability under § 1983, the policies or customs of a municipality must be "the 'moving force [behind] the constitutional violation.'" *Canton,* 489 U.S. at 389, 109 S.Ct. 1197 (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). There must be a causal nexus between the plaintiff's injury and the municipality's alleged policy or custom. *Monell,* 436 U.S. at 693–94, 98 S.Ct. 2018. Simms fails to present evidence of such a causal nexus.

Although Simms complains, as well, that the training regimen followed by the County is in some sense insufficient, he fails to present evidence sufficient to permit a jury to find that the County made a deliberate, conscious choice to adopt a deficient policy or to have no policy regarding training of its correctional officers in the proper use of force or, that any such alleged omission directly resulted in his injury. The deficiency in training must make the occurrence of the specific violation a "reasonable probability rather than a mere possibility" when the exigencies of police work are considered. *Semple,* 195 F.3d at 713 (quoting *Spell,* 824 F.2d at 1390). Thus, a plaintiff must establish a direct causal connection between specific deficiencies and a specific injury. *Id.* (citing *McWilliams v. Fairfax County Bd. of Supervisors,* 72 F.3d 1191, 1198 (4th Cir.1996)); *Board of*

County Commissioners of Bryan County v. Brown, 520 U.S. 397, 415, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). *See Buffington v. Baltimore County,* 913 F.2d 113, 122 (4th Cir.1990), *cert. denied,* 499 U.S. 906, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1991)("It is not sufficient to prove that an injury or accident could have been avoided if an officer had had better or more training ...."). Accordingly, whether the *Monell* claim is properly focused on *training to deal with mentally ill detainees* or *training on the use of force,* or *some combination* of these two distinct theories, the County is entitled to summary judgment.

## V.

For the reasons set forth, I am persuaded that plaintiff is entitled to present his claim of excessive force to a jury and that, as to that claim, summary judgment must be denied because a reasonable fact finder could reasonably conclude that defendants Bruce, Mack, and Lyles are jointly and severally liable for violating the Fourteenth Amendment due process right of Christopher B. Simms. As to all other federal claims, defendants are entitled to summary judgment.

As I stated at the motion hearing, I presume that the defendants will exercise their right to an interlocutory appeal in this case. Accordingly, I shall stay all further proceedings pending the defendants' decision whether to appeal the denial of qualified immunity. If the order denying summary judgment is reversed on appeal and all federal claims are finally determined against plaintiff, then I shall remand this case to the Circuit Court for Prince George's County for the adjudication of the state law claims. If the denial of summary judgment as to the excessive force claim is sustained and the case remanded to this court, then I shall determine which of the parallel state law claims

shall be allowed to go forward, and schedule a prompt jury trial.