UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BYRON B. SIMMS, as Guardian and
Next Friend of Christopher Byron
Simms,

*Plaintiff-Appellee,*

v.

KENNETH BRUCE; JOSEPH LYLES;
KENNETH MACK,

*Defendants-Appellants,*

and

CHARLES DOUKAS; ELLENDER
FRANCETROUPE; KENNETH CARROLL;
JASON DUCELLIER; BARRY STANTON;
BEN YUE; PRINCE GEORGE'S COUNTY,
MARYLAND; JANICE HARDESTY,

*Defendants.*

No. 03-2181

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Andre M. Davis, District Judge.
(CA-02-3506-AMD)

Argued: May 7, 2004

Decided: July 19, 2004

Before WIDENER and GREGORY, Circuit Judges,
and C. Arlen BEAM, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

Affirmed by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** Kevin Bock Karpinski, ALLEN, KARPINSKI, BRYANT & KARP, Baltimore, Maryland, for Appellants. Steven Bruce Vinick, JOSEPH, GREENWALD & LAAKE, P.A., Greenbelt, Maryland, for Appellee. **ON BRIEF:** Victoria M. Shearer, ALLEN, KARPINSKI, BRYANT & KARP, Baltimore, Maryland, for Appellants. Timothy F. Maloney, Brian J. Markovitz, JOSEPH, GREENWALD & LAAKE, P.A., Greenbelt, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

While awaiting trial on assault and related charges, Christopher Byron Simms (Simms) was detained at the Prince George's County Detention Center. He suffered severe and permanent injuries during an altercation with three prison officers. Acting as Simms's next friend, his father sued the officers, alleging, among other things, that they violated Simms's due process rights. The district court denied the officers' qualified-immunity-based summary judgment motions, and the officers filed this interlocutory appeal. We affirm.

Before reciting the facts, we address how our limited jurisdiction shapes the evidence we may consider.

I.

The finality rule and the collateral-order doctrine govern our jurisdiction. We are granted authority under 28 U.S.C. § 1291 to review

a district court's final judgments. This finality rule prevents us from reviewing most interlocutory orders because they are not final decisions. But the collateral-order doctrine carves out a small class of pre-judgment edicts that are "final" enough to be appealable, under section 1291. *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996); *Johnson v. Jones*, 515 U.S. 304, 309 (1995); *Gray Hopkins v. Prince George's County*, 309 F.3d 224, 229 (4th Cir. 2002); *see Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 546 (1949).

At the summary judgment stage, when an official asserts qualified immunity, the district judge must do several things. She must determine whether, when viewed in the light most favorable to the plaintiff, the facts could support a jury finding that the defendants violated the Constitution. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). And viewing the facts in this same light, the district judge must then determine whether such conduct violated clearly established law. *Id.* at 201. But importantly, the district judge performs one task that is often overlooked: before answering the legal questions, she must determine *what the facts look like when viewed in the light most favorable to the plaintiff*. This task requires the judge to resolve evidentiary conflicts in the plaintiff's favor. But because the plaintiff is entitled to only *reasonable inferences*, the district judge must determine what inferences are reasonable.

Our interlocutory jurisdiction is narrower. *Gray Hopkins*, 309 F.3d at 229. During an interlocutory appeal brought under the collateral-order doctrine, we have no jurisdiction to quarrel with the district court's preliminary task of constructing the record in the light most favorable to the plaintiff. *Martin v. Dishong*, 57 Fed. Appx. 153, 154 (4th Cir. 2003); *see Behrens*, 516 U.S. at 313; *Gray Hopkins*, 309 F.3d at 229. We must assume the district court organized the facts and resolved the inferences correctly. *See Dishong*, 57 Fed. Appx. at 154. Thus, our task is limited to asking whether the facts, *as recited by the district court*, show the defendants violated clearly established law. No matter how a defendant frames his challenge on interlocutory appeal, we have no jurisdiction (and thus no need) to peruse depositions, exhibits, or expert reports to determine whether the district court inferred too much or speculated from too little evidence. *See Gray Hopkins*, 309 F.3d at 229 (citing *Winfield v. Bass*, 106 F.3d 525, 529 (4th Cir. 1997)).

This case illustrates our limited jurisdiction. The parties dispute what happened when the officers entered Simms's cell. And they dispute whether the district judge drew reasonable inferences from expert testimony. But these arguments, under whatever disguise, seek to alter the facts as the district court viewed them. We have no jurisdiction to consider such an alteration at this stage.

II.

On the morning of September 11, 1998, Simms caused a disturbance at the jail by throwing water from his cell. When jail officials entered the cell to disable the water system, Simms ran out of the cell and into the common area. Members of the Emergency Response Team (ERT) responded, restrained Simms without seriously injuring him, and took him to another unit.

Simms's cell in his new unit was basic. It had a sink, a toilet, and a metal desk to the right of the doorway, and a bunk bed against the wall directly across from the doorway. The only way to see into the cell was through an eight-by-five-inch window in the door.

Later that day, the ERT, comprised of defendants Kenneth Bruce, Joseph Lyles, and Kenneth Mack, received a nonemergency report about Simms causing another disturbance. This time, Simms was banging loudly on his door, using profanity, throwing toilet water on the floor, and being generally disruptive. An on-duty sergeant authorized the use of restraints to prevent Simms from harming himself. By the time they arrived at Simms's cell with the restraints, the ERT members could see water coming from under the door, but found Simms quiet, lying on his bed with his hands behind his head.

Due to the injuries he suffered that day, Simms remembers nothing more about the incident. Thus, to construct the record in the light most favorable to Simms, the district court was limited to two types of evidence. First, the ERT members testified about the sequence of events. And second, Simms's expert witnesses challenged the officers' versions, based on the nature and extent of Simms's injuries, along with the cell's layout.

According to the ERT members, the following facts reflect what happened after they arrived at Simms's cell. Officer Bruce looked through the window and told the other officers that Simms was sitting or lying on his bunk bed and that there was water on the floor. Bruce ordered Simms to get on the floor and to place his hands behind his back. Simms remained on the bunk. Lyles, the team leader, then ordered the officers to enter the cell.

Mack opened the door. Bruce entered first. Simms remained on the bed, with his hands behind his head, despite being ordered to the floor. Bruce approached Simms and tried to pull him onto the floor using an arm-bar technique. Simms resisted and a struggle ensued. Officer Bruce slipped on the wet cell floor, and caught himself on the sink. Simms, by that time, was somehow off the bunk, trying to bite Bruce's leg and Mack's hand.

Lyles entered the cell to pull Simms away from Bruce and Mack. Lyles grabbed Simms's prison suit as Lyles slipped on the floor. Mack and Lyles tried to take Simms down and handcuff him. Simms continued to resist. Somehow, the officers found themselves back on their feet. They tried to stabilize Simms by restraining him against the wall, but the three officers were unsuccessful because the water made it hard to grasp him.

They all then spun around and found themselves back on the floor struggling. According to the officers, when Simms went to the ground, he first went to his knees, then to his chest, and then to the floor. In other words, Simms's head did not violently strike the ground during the takedown. At some point after Simms reached the ground, he suddenly stopped struggling and the officers handcuffed him. All three officers attest that at no time did any of them hit, kick, or punch Simms during the fray.

After they handcuffed Simms on the ground, the officers noticed blood on the floor and realized Simms's nose was bleeding. Simms was unconscious. They then moved Simms outside of the wet cell so he could receive medical treatment. Lyles called out a medical emergency and the nurses soon arrived.

The nurses found Simms face down with blood around his face and head, and concluded Simms had suffered forceful blunt head and

facial trauma. Simms did not respond to oral commands. None of the officers were hurt.

After Simms was treated in the jail's medical unit, Sergeant Bybee transported him to Prince George's County Hospital. Simms suffered black eyes, abrasions, a fracture to the left orbital floor and the nasal bone, subdural hematoma or hematomas, subarachnoid brain hemorrhage, a hydrocephalus, cerebral atrophy, ventricular dilatation, a subdural hygroma, and intracerebral blood collection. *Simms v. Hardesty*, 303 F.Supp.2d 656, 663 (D. Md. 2003).

The hospital discharged Simms on September 28th. His stay lasted seventeen days.

Simms argued below that the circumstantial evidence supported a different version of events. He argued that, despite the officers' insistence that they struck no blows, the evidence supported a reasonable inference that "he was subjected to a severe beating with fists, booted feet, and perhaps a baton, and/or that his head was thrust violently into or against the steel toilet bowl that was present in cell 215 at the time of his struggle with the officers." *Id.*

The district court concluded that Simms's circumstantial evidence was sufficient to support his version of what occurred. We have no jurisdiction to challenge that conclusion, so we need not detail Simms's evidence. We simply accept, for this appeal, the district court's conclusion that the record evidence supports a reasonable inference that "Simms was beaten and kicked into submission" and that his head was bashed inside or into the toilet. *Id.* at 668, 671. It is that sequence of events that guides our review.

III.

To determine whether the officers are entitled to qualified immunity, we must ask two questions. *Saucier*, 533 U.S. at 200. First, we must ask whether the facts, viewed as we described above, show that the ERT members' conduct violated Simms's constitutional right to be free from excessive force. *See id.* at 201. If the answer is no, we proceed no further. But if the answer is yes, "the next, sequential step

is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* The ultimate inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.* at 202.

To prevail on his Fourteenth Amendment excessive-force claim, Simms must satisfy the same legal standards that a sentenced prisoner must satisfy under the Eighth Amendment. *See Taylor v. McDuffie*, 155 F.3d 479, 483 (4th Cir. 1998); *Riley v. Dorton*, 115 F.3d 1159, 1166 (4th Cir. 1997). Therefore, he must satisfy both a subjective and an objective standard. Neither party disputes Simms's ability to meet the objective prong, so we focus on the subjective prong.

To satisfy the subjective prong, Simms must show that the force the officers used inflicted unnecessary and wanton pain and suffering. *Stanley v. Hejirika*, 134 F.3d 629, 634 (4th Cir. 1998)(citing *Hudson v. McMillian*, 503 U.S. 1,6, (1993)). Because Simms's claim arises out of force used during a "prison disturbance," he must show wantonness by proving that the ERT members used the force "'maliciously and sadistically for the very purpose of causing harm'" and not as part of a good faith effort to maintain or restore discipline. *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).

From the facts as we must view them, a reasonable jury could infer wantonness. When the ERT members arrived, Simms was lying on his bunk with his hands behind his head. The officers acknowledge a later struggle, but deny striking any blows. The district court, however, determined that the evidence supported reasonable inferences that Simms was beaten and kicked into submission by officers who found him lying on his bunk, and that the ERT members bashed Simms's head inside of or into the toilet. If the jury discredits the officers' testimony, finds that the officers beat and kicked Simms into submission, and finds that the officers bashed his head into a toilet, then the jury can reasonably infer that this beating went beyond a good faith attempt to restore order.

Even if undisputed, the fact that the officers initially approached the cell in a good faith attempt to restore order does not immunize the officers' later actions from a wantonness finding.

Further, in September of 1998, it was clearly established that pre-trial detainees were protected from wanton beatings that exceeded good faith efforts to restore order. Under the facts the district court articulated, we affirm because a reasonable officer would have known that his conduct violated a constitutional right if, under circumstances like Simms's, "he or she were to use a booted foot to kick (in and about the face and head), and, contemporaneously, if he or she were to bash the face and head of such a detainee into a toilet." *Simms*, 303 F.Supp.2d at 669.

During this interlocutory appeal, we are constrained to view the factual record the way the district court did. We accept at face value the district court's view of what reasonable inferences a jury could draw from Simms's evidence. If the events occurred the way the district court described them (in the light most favorable to Simms), then the officers violated Simms's clearly established constitutional right.

*AFFIRMED*